J. A. STEEN et al., Appellants, v. J. M. STEEN et al., Appellees.

WITNESSES: Evidence—Transactions with Deceased—Testimony of Deceased Introduced—Effect. A party to an action may testify fully to a personal transaction or communication with a person deceased, when the testimony of such deceased person as to such personal transaction or communication is introduced into the record by his adversary. (Sec. 4604, Code.)

PRINCIPLE APPLIED: A father executed to his son a deed. Soon thereafter some of his children brought an action praying

that the court appoint a guardian for the father. At this hearing the father testified fully in regard to the transaction and communications passing between himself and his son which culminated in the deed in question. After the death of the father, his children, other than grantee in the deed, brought this instant action to set aside the deed on divers grounds. Plaintiffs introduced the testimony of the father given upon the application for guardianship. *Held,* this opened the door to the grantee to testify to the same transaction and communications.

**DEEDS:** Undue Influence—Mental Incapacity—Father and Son—
2   Fiduciary Relation—Burden of Proof. The naked fact that the grantee in a deed is a son of grantor does not throw upon grantee the burden of proof to show there was no undue influence exercised upon grantor in the execution of the deed. The burden of proof to show undue influence clings to him who alleges it until he establishes the confidential and trust relationship. In the instant case no such trust relationship was established.

**DEEDS:** Consideration—Support by Child—Property Exceeding Support.
3   port. An agreement to support and care for the grantor during his life is a sufficient consideration to support a deed, even though it turns out that the value of the property conveyed largely overpaid for the support of the grantor.

**DEEDS:** Parent to Child—Preferring Child—Prejudice Against Child
4   —Effect. The fact that a parent is influenced by prejudice against certain of his children, founded upon a rational conception of his relationship to them, or that he has a preference for one over another, where this seems to have a rational basis, is not sufficient to justify the court in setting aside his deed. In instant case, *held,* deed should not be set aside.

**WITNESSES:** Transactions with Deceased—Non-Participation in
5.  Transaction. A party to an action may testify to a transaction or communication between a deceased person and another in which he took no part.

*Appeal from Harrison District Court.*—HON. O. D. WHEELER, Judge.

TUESDAY, FEBRUARY 23, 1915.

ACTION in equity to set aside a deed on the ground that the grantor was mentally incapable of making a valid conveyance, and further, that in procuring the conveyance, the

grantee exercised undue influence over the grantor.  Decree for defendants.—*Affirmed.*

*Cochran & Barrett,* for appellants.

*J. P. Organ* and *Burke & Tamisiea,* for appellees.

GAYNOR, J.—Upon and prior to the 23d day of October, 1911, John Steen was the owner of the land in controversy, consisting of about 100 acres.  On that day, he and his wife, Jerusha Steen, one of the defendants, conveyed the same by warranty deed to his son, the defendant herein, John M. Steen. This deed recites a consideration of $10,000.00 in hand paid and was duly recorded.

John Steen died on the 30th day of December, 1911.   The plaintiffs and the defendant, John M. Steen, are his children, and Jerusha Steen is his widow.  This action is brought by the plaintiffs as heirs at law of John Steen to set aside this conveyance on two grounds.

1st. That John Steen, the grantor, was incompetent to make the same at the time it was made, by reason of advanced age, infirmity, and sickness, and that he did not and could not comprehend the full effect of his act, and by reason of mental weakness, did not understand he was conveying the property, and that the deed was without any consideration.

2nd. That he was unlawfully influenced to make the deed; that undue influence was exercised over him at a time when he was sick and infirm, and his mind weak, and he was easily influenced; that this undue influence was exercised by the grantee in the deed, John M. Steen, and the other defendant, mother of John M. and wife of John Steen, in this,—that they excited undue prejudice against the plaintiffs and other influences which it is not necessary to set out here.

John Steen, at the time of his death, was about eighty-two years of age.  He had nine children living, three girls and six boys.

This case was tried in open court before the court, and,

after a full submission, the court found for the defendants, dismissing plaintiffs' petition and entering a decree in favor of the defendants on their cross-petition, quieting title in them against the claims of the plaintiffs. From this decree plaintiffs appeal, and urge:

1. That upon the evidence submitted the court erred in finding for the defendants, and in not finding affirmatively both want of mental capacity and undue influence, as charged by the plaintiffs.

2. That incompetent testimony was admitted over the objection of the plaintiffs.

This case is triable *de novo* here, and it is our duty to review the entire record and exclude from our consideration all evidence that is not competent and relevant to the issue tendered, and all evidence that comes from the lips of witnesses who were incompetent to deliver it.

The first error relates to the action of the court in permitting Jerusha Steen, the widow, to testify on the part of defendants, to personal transactions had with her husband touching this matter, and the general rule is invoked to bar such testimony, reliance being had on the provisions of Sec. 4604 of the Code of Iowa; *Hanson v. Gallagher*, 154 Iowa 192, 199; *Clarity v. Sheridan*, 91 Iowa 304, and *Cochrane v. Breckenridge*, 75 Iowa 213.

Whether the court erred in the admission of this testimony depends upon the construction that must be given to the last clause in this section, which reads: "But this prohibition shall not extend to any transaction or communication as to which . . . the testimony of such deceased . . . shall be given in evidence."

The plaintiffs, in support of their contention, offered themselves as witnesses and were examined upon this trial, fully detailing all that transpired within their knowledge, and all the facts and circumstances relating to the habits, life, and condition of the deceased, about and prior to the time of the making of this instrument.

It appears that after this deed was executed and about the 13th day of November, 1911, an action was brought by some of the children of John Steen, deceased, to have a guardian appointed for him. A hearing upon that application was had and John Steen, now deceased, was called by the plaintiffs and examined in open court before the jury, and his testimony taken down in shorthand. At the conclusion of his testimony, the cause against him was dismissed by the attorney representing the plaintiffs in that cause, with this remark: "Uncle John, (referring to John Steen), I don't think you need any lawyers or witnesses. I am going to withdraw this case, but I made up my mind to satisfy myself."

Upon the trial of the present case, the testimony of John Steen, so taken at that hearing, was introduced in evidence by these plaintiffs, and is as follows:

"My name is John Steen. I will be 82 years old next birthday. I was born and raised in Pike County, Ohio, and settled in Harrison County in 1865. I first bought a farm over near Mondamin, and later moved to Calhoun Township. I have nine children living. John is 25 years of age and married. I have always been on good terms with my children. I have never been very sick, I have worked pretty hard and never been idle much. I worked along until the last two or three years. I was on the farm and had charge of the cattle and stock and horses. I did not farm much, I saw it was too much work for me and I quit and turned over the farm to my son Joe, and I went down to Missouri Valley and bought me a house there. I stayed there and run my business until a short time ago, and I then moved out onto the farm because it was too much work for my boy, and John was the next boy he was hauling the wood and getting nothing for it and doing a whole lot of work for me, and we concluded we had better come together, and I sold him 100 acres of land and he was to build a house and keep me and his mother as long as we lived. And so I lived along with him and we are living there

now, and are building a house to live in right close to John's.
He has always been good to me and is the only one that ever
did wait on me. He hauled wood and corn and grain and hay,
and I did not want him to be working there alone and so we
moved up there. When I made the deal with John, we had
writings about it. I sold him 100 acres, the old home, and he
was to give me $10,000.00 for it, and he paid me $4,000.00
down and then I took a contract for the balance, and he was
to pay what we needed out of that for our help. I don't
know where he got the $4,000.00 that he paid me, but I think
he made a mortgage. The $6,000.00 is in separate contract
and he takes care of my wife and me as long as we live, and
whatever we cost him on that account. And then he pays me
5½ per cent on that $6,000.00, and, of course, when we are
gone, the rest will be paid out. I won't be there to count it
and he and they can count it, that will be the difference. He
has been buying things for us ever since we made the deed.
We are just there as a family.''

Q. ''He is going to pay you the other $6,000.00 by keeping you and your wife?''

A. ''Yes, sir.

''He has to take care of us in every respect. We are not
supposed to do anything unless we want to. He has to take
care of us as long as we live, through sickness and health
until we pass out. Now we may live that all up, and maybe
not. I made this arrangement with John before I sold my
house and lot at the Valley. We had this understanding and I
made him a deed to the land and he commenced to build a
house, and he is putting up a good house and he furnishes
the house. He gets his money to build the house out of the
cornfield. He farmed the place last year and has got lots of
corn. I rented him the land for two years before and he was
to give me for rent one-half of all the corn and wheat and
everything. The corn has been sold and we got the money
long ago. I got my share of the crop and have had plenty of
money all the time. I have 201 acres of land besides what

I sold to John. I did not offer the 80-acre farm for $60.00 an acre. I have refused $60.00 an acre for the land that is unimproved. The 100 acres that I sold John is worth $100.00 an acre. I was not offered $12,000.00 for it. I would not have sold it to an outsider at all, because I had this 301 acres of land, expected to keep it for the benefit of my family. I still have 201 acres. I have never offered that for sale.''

Q. ''Now, did you take notes and mortgages from John for this 100 acres?''

A. ''Well, I have a written contract just as I stated to you, a written contract for $6,000.00, and you know he pays that by keeping us and taking care of us.

''We drew that contract ourselves. It is here in my pocket. I ain't much of a business man, but I have always kept my business straight and right up to the dollar.''

Counsel asks witness for the contract and same is handed to him and marked Exhibit ''1'' and offered in evidence.

''The name John M. Steen on that contract is that of my son, and the name Frances M. Steen is that of his wife. That explains the whole affair between John M. Steen and old John Steen. There is nothing outside of that.''

Q. ''What kind of a writing did you give them to sign?''

A. ''That is all we needed. The obligation is on him the way we looked at it. There is no obligation on us, and consequently, he and his wife wanted it.

''We did not put the contract of record because we did not think it was necessary.''

Q. ''Now, you remember the incident of making a deed out, don't you?''

A. ''I remember everything of course, there is nothing wrong with my head.

''We didn't think it was necessary to have it recorded. That showed to him and me and the rest of the children just what we had done, that is the way we looked at it. We didn't know we were going into law. I have somewheres near forty

head of cattle, four head of horses, one mule and seventeen head of hogs.  Joe is running that part of it you know.  I am on section 30 and over in 25 I have an 80, and then we are getting the hay on 21 on the hill.  There is 80 up there and that makes the 201 acres.  For rent I got one-half all the time. The income from all would amount to about $1,500.00.  I never estimated how much it would cost to keep me and my wife a year, John wanted to buy the land and I did not need it, and was going to sell him that in order to go in partnership there and have a home as long as we lived.  We talked about making a trade and we made a trade.  That was all there was to it.  I don't know when he first spoke about buying the land.  He was working for me unnecessarily and I thought we would come together, and he would take care of me without working so much for me.  I don't remember whether he spoke to me or I spoke to him first about the matter.  My wife was anxious to have it.  She wanted to be with him, and she thought she would not have so much hard work to do and it would be less trouble for all of us.  I have been on the mope the last couple of years.  I ain't been down much.  I ain't been sick but two or three days at any time. The last time, Dr. Devore attended me a little.  I took a congestion and chill and my blood was running slow.  I was getting old and there was one day and night last winter I did not know anything.  Then Dr. Devore brought me out of that and I have been on my feet ever since.''

Q. ''Did you have any talks with all the members of the family present before you made this deal with John?''

A. ''Yes, sir, I told them what we were going to do, I do not know as I seen any of them.  It was common talk.''

Q. ''Name the children that you talked in the presence of.''

A. ''I wasn't making a minute of it, and I could not answer about it.  But there was John and Frank and Rene and Ada.  Them four you know was passing back and forth, and of course I talked with them.''

Q. "Did you tell them what you were going to do?"

A. "Yes, sir, I had no secrets about my business at all.

"I can't say which of the boys worked on the farms most. They worked for me and went to school until they arrived at age when they were able to do men's work. I don't think there was but one of my boys that stayed with me until he was 21. I was able to run my business without binding them you know, and then when they had finished their schooling and they wanted to go, and some went at 17, and some at 18, and there was but one that stayed until he was 21, that is Willis. He is south, I don't know where. I paid out about $400.00 in cash to help him get a team, etc. But his ability wasn't good enough to do business and after I had gone so far, I stopped. I had done my duty. I had done the same with Frank, etc., and when I thought I had done my duty as a father, I stopped. I don't think I gave John anything when he got married, not directly. He came home and went to work. I can't recall that I paid any debts for him."

Q. "You could not give any of your boys any send off on their ability to accumulate property?"

A. "I tried to help them to work and let them use my teams and they didn't cost them a cent. And I have helped them a little now and then, and I have always had plenty of cattle, and when they were short on cows, I said, 'Here, take a couple of cows.'

"We were down there and no wood or feed or anything, and I kept a cow and horse there for convenience, and somebody had to take and haul this stuff to us from the farm. And John, he took right hold and done everything for us he could do and got our wood and hay and corn, and you know it worked up a sympathy for him. You know how it would be. Ma at first said we should get closer together, that is the way it started. And after we had commenced thinking about it, we made up our minds we would get together and now we are together. That is all there is to it. Ada was a matron in the hospital, and her man lives in Michigan. He is traveling

agent for a company there. Rene is working down in the hospital and has been for a couple of years. All my children are comfortable, but they haven't accumulated anything ahead, some of them and some of them have. Some have a business of their own but none of them that I know of, own a home. I have 201 acres of land left, and there is not a nickel against it, and I don't owe a dollar in the world. The land I gave John is the old farm I first bought of Grandad Belden. I worked there and lived there a long time, and accumulated a little more land. The land I sold John is about a mile south of Calhoun. The 80 acres is about a mile north. I bought more land up there on 18, and then I got 121 acres, which, with this 80, makes 201. I bought a piece of property in Missouri Valley for $1,200.00 and sold it for $800.00. I got for it a $500.00 note drawing interest, and four town lots in Missouri Valley. I got rid of the property because I did not have any use for it. I considered that the income on the town lots and the interest on the property was worth more than would pay me for taking care of it. But I done the best I could with the property. I could not have done any better. I have had no offers for the property in the hills. A number of times men would have liked to buy it, but it wasn't for sale. I deeded my wife 40 acres you know so that if anything happened to me she could hold her home, and then we wanted another home different, and so we sold that to John and that's all there is to that."

Q. "I suppose you thought the matter over quite a while and talked it over with your wife and talked it over with John and his wife?"

A. "Yes, sir, I have no secrets about that."

Q. "And they promised very faithfully that they would carry out that deal and take care of you as long as you lived?"

A. "Yes, sir, and I believe it.

"I have lived close to John most of the time for 25 years, since he was born, and he stayed around me and worked with me you know and he was with me. He was down in Oklahoma

for two years. I moved down to Oklahoma too, but I had not come back when John did. I couldn't get any land in Oklahoma. I had worked and deeded 160 acres of land and Uncle Sam would not let me file on anything. I bought one the first week I was down there, the prettiest house you ever saw and barn, etc., and I turned it over to my son-in-law, Frank Wadsworth, because at the land office they would not let me have it. But Frank Wadsworth has it now. I paid for it though I never made a will. Oh, I have had an intention but I am not worrying about it.''

Q. ''Have you had any talk with Mrs. Dennis, your daughter, about this transaction with Johnny?''

A. ''No, she got awful mad about it and didn't like it at all, and she is a woman of marrying age, and has been doing for herself for a long time. I have run my business all my life, ever since I have been a man, and I have never had a dollar given to me, and I have just come along up and raised my family, and there was never a time that I could not put my hand in my pocket and get a dollar if I wanted it. She got mad and took to the road and I did not think it was any of her business. I have raised this family and have had plenty of money all the time. I gave Willis about $400.00 in money and Frank about $300.00. I did not keep any account of that unless I took some notes. I did not calculate it, no, sir. They just squared it.''

Q. ''You do not recall about making a will or talking about a will?''

A. ''No, sir.''

Q. ''You are just down to that part of life where you and your wife needed a little better care?''

A. ''That is just it. We might have made a mistake, no man is perfect, no, not one. And we thought we had done what was right for our benefit. And of course, he should have had a benefit.

''I just put that $4,000.00 in the bank for 4 per cent interest and I don't know of anything I could use it for to

an advantage. You know I want to make an honest dollar, and so if I could strike something that there was some money in, I can draw that money any time, but I want that to pay the interest."

Mr. Cochran: "Uncle John, I do not think you need any lawyers or witnesses. I am going to withdraw this case, but I made up my mind to satisfy S. H. Cochran."

On the same day that the deed in question was made, the following agreement was signed by the defendant, John M. Steen, and his wife, Frances M. Steen, and delivered to the deceased:

"The 23d day of October, 1911, We, John M. Steen and Frances M. Steen, husband and wife, do hereby agree to pay John Steen and Jerusha A. Steen, his wife, both or either of them, interest at the rate of Five and a half per cent on the sum of Six Thousand Dollars as long as either of them shall live; the interest to be paid annually or semi-annually dictated by them. We further agree to give them the use of the house now under construction on the farm conveyed to John M. Steen by them, free of all charge and rental, as long as both or either of them shall live. We further agree to furnish said house with first class workmanship in every respect. We further agree to keep them supplied at all times with wood as fuel and to give them free access to water and garden and meat of that grown on place; and to care for and milk a cow for them and to give them the privilege of keeping a horse and vehicle on the place for their private use. We further agree to care for them in time of sickness to the best of our ability, and in accordance to their dictates, to procure necessaries for them from town at any time. If both or either of us, the first parties, should become deceased, John Steen or Jerusha A. Steen shall have the aforesaid benefits of the farm as long as either or both of them shall live. When both the second parties become deceased, the said premises and all im-

provements become the private property of the first parties, and all interest stops.''

.   This is the contract referred to in John Steen's testimony, hereinbefore set out as Exhibit 1.

The next day after the dismissal of the application for appointment of a guardian for John Steen, the parties entered into the following contract:

"John M. Steen and Frances M. Steen, husband and wife, hereby agree, and all the parties hereto fully understand, that, in addition to the contract heretofore made, dated and signed October 23d, 1911, that at the death of John Steen and Jerusha A. Steen, all debts for the land described in the foregoing contract are discharged and to an end, both interest and principal. Dated and signed November 24th, 1911.''

These two contracts were, on that date, pinned together and delivered to either John Steen or his wife, Jerusha, it does not definitely appear which.

At the conclusion of plaintiffs' testimony, John M. Steen was called in his own behalf, and over the objection of the plaintiffs was permitted to testify that he was the grantee in the deed in controversy; that, at the time the deed was made, he was renting the one hundred acres therein named, from his father, and after the making of the deed, he continued in possession; that, in connection with the purchase of the land, there was a written agreement made between him and his father (this agreement is the one referred to by John Steen in his testimony, hereinbefore given) ; that he and his wife both signed it on October 23, 1911. He testified, "I heard my father's testimony read. Before that deed was made, my father offered to sell the land to me for $10,-000.00, I to pay $4,000.00 in cash, and to provide fuel, meat and take care of them as long as they lived. The house is under construction, but not finished, and they were to have

1. WITNESSES: evidence: transactions with deceased: testimony of deceased introduced: effect.

the use of it free of charge, and, of course, everything on the place.  I was to pay $4,000.00 in cash, and the balance, $6,000.00, was to draw interest, and at his death, the $6,000.00 was to be mine, and the land.  The horses referred to in my father's testimony were his and are part of the estate.  I entered into these contracts with my father in good faith. The new house was completed on November 24th, except lathing and plastering.  Father and mother never lived in the new house.  They lived with me in the old house.  I paid my mother the $340.00 interest on the $6,000.00 after my father's death.''

There were other matters drawn out from this witness on cross-examination that were in no way responsive to or explanatory of the testimony given by John Steen, the deceased.  Of this, the plaintiffs cannot complain.  They do, however, object to any testimony from John M. Steen, on the ground that he was incompetent to give it, and this would be true if it were not for the exception provided in Sec. 4604. The object of closing the mouth of a party against testifying to personal transactions with a deceased is that the other party, being dead, cannot, of course, give his version of these facts, and the door might be opened to perjury and fraud; but where the testimony of the dead party as to the same matter is fully before the court, the reason for the rule does not obtain, and therein lies the reason for the exception.  It will be noticed that on the direct examination, the testimony of John M. Steen was confined entirely to those matters referred to in the testimony of John Steen, his father, and to nothing else.  In the testimony of John Steen is found a full explanation of the making of these contracts, and of the consideration agreed upon, and the motive that led up to the making of them.  At the time this last contract was made, John M. Steen testified that his father said to his mother that the contract was not clear as to where the $6,000.00 was to go; that he had not made any provision for it in the original contract.  He

said to make an amendment and make it more clear. "He suggested we write it out in an amendment. I had no knowledge of his intention to do this prior to that. My father first mentioned this method of disposing of the $6,000.00.''

We think the testimony of John M. Steen was clearly within the exception provided in Sec. 4604, hereinbefore referred to, and the court did not err in permitting him to testify.

It is next contended that the burden of proof in this case is on the defendants to establish want of undue influence.

2. DEEDS : undue influence : mental incapacity : father and son : fiduciary relation : burden of proof.

It is contended that the conveyance was without consideration and that the relationship of the parties was of such a character that the burden of proof should be placed upon the shoulders of the parties seeking to maintain the good faith and integrity of the transaction,—upon the party who reaps the benefit.

The general rule is, that the burden of proof is on the party seeking to establish undue influence. The exception is, where there is established a fiduciary and close confidential relationship between the parties, and special trust and confidence reposes in the recipient of the bounty, the burden shifts. Upon this point see *Reese v. Shutts,* 133 Iowa 681; *Chidester v. Turnbull,* 117 Iowa 168; *Mallow v. Walker,* 115 Iowa 238; *Curtis v. Armagast,* 158 Iowa 507.

The mere fact of the relationship of parent and child does not, in and of itself, establish a relationship that casts the burden upon the child when a conveyance is from the parent to the child.

This case is peculiarly clear of any fiduciary or confidential relationship existing between the father and the son. John Steen, Sr., seems to have been a man of strong will, of clear mind, of good business ability, a man who, as he says himself in his testimony, always attended to his own business. "I have run my business all my life, ever since I have been a man, and I have never had a dollar given to me, and

I have just come up and raised my family, and there never was a time that I could not put my hand in my pocket and get a dollar if I wanted it." There is no evidence of any influence used by John M. Steen to induce his father to make the conveyance. The reason John Steen, Sr., assigns for making the deed, in the testimony which he gave in the trial heretofore referred to, is that "John took right hold and did everything for us he could do. He got up our wood and our hay and our corn, and you know, that worked up a sympathy for him. Ma said we should get closer together. That is the way it started, and after we commenced thinking about it, we made up our minds we would get together, and we are together, and that is all there is to it."

It is contended that one element in this case is that the conveyance was without consideration, but the agreement between the parties and the testimony of John Steen, Sr.,

3. DEEDS : consideration : support by child : property exceeding support.

himself shows that it did rest upon a consideration. In the absence of undue influence or fraud, a party in the possession of his faculties has a right to make a gift or a conveyance of his property upon any consideration that he may fix, except as against his creditors. An agreement to support and care for the grantor during his life is a sufficient consideration to support a deed, even though it turn out that the value of the property conveyed largely overpaid for the support of the grantor. See *Pellizzarro v. Reppert*, 83 Iowa 497; *Schneitter v. Carman*, 98 Iowa 276; *Walker v. Walker*, 104 Iowa 505; *Lewis v. Wilcox*, 131 Iowa 268.

The right of a parent, either by will or by deed, to make such a disposition of his property as he may see fit cannot be questioned by his heirs, without an affirmative showing that

4. DEEDS : parent to child : preferring child : prejudice against child : effect.

he was incapable of making the conveyance, or that the act was not his because of undue influence exercised upon him. The fact that he is influenced by prejudice against his children, founded upon a rational conception of his relation-

ship to them, the fact that he has a preference for one child over another, where this seems to have a rational foundation, is not sufficient to justify the court in undoing what he did. See *Nowlen v. Nowlen*, 122 Iowa 541; *Kennedy v. McCann*, (Md.) 61 Atl. 625; *Justice v. Justice*, (N. J.) 18 Atl. 674.

There is another rule that has been recognized in this court, and this applies to the testimony of Frances M. Steen, wherein she undertakes to state what was said between her husband and his father preceding the making of these contracts, and it is this: "Though a party, who comes within the inhibition of the estate, cannot be permitted to testify to personal transactions between him and the deceased, yet he may be permitted to testify to conversations in which he took no part, but which he overheard between the deceased and another." This rule is stated in *Johnson v. Johnson*, 52 Iowa 586.

5. WITNESSES: transactions with deceased: non-participation in transaction.

We have not attempted to set out all the testimony—much of it appears to us inconsistent and unreasonable; much, mere opinion founded upon no substantial basis; some of it, we fear, influenced by considerations of personal gain; some of it, so flatly in contradiction of other testimony which seems to us to be entitled to as much, if not more, credit that we do not feel like setting it out. We have examined the record with care and are satisfied that John Steen, Sr., was competent to make this deed; that no undue influence was exercised upon him in the making of it; and that, while it may seem unfair to some of the other heirs, yet it must stand as his deed. The mere fact that the deed seems to involve an inequitable distribution of his property, in the absence of more, does not justify the intervention of this court.

We find no reason for interfering with the judgment of the court below, and the cause is—*Affirmed*.

DEEMER, C. J., LADD and SALINGER, JJ., concur.