HARRY ALBAUGH et al., Appellants, v. WILLIAM SHROPE et al.,
Appellees.

FRAUDULENT CONVEYANCES: Confidential Relations. A convey-
1   ance by an aged grantor in consideration of love and affection will
    not be deemed *presumptively* fraudulent because the grantee is the
    grandchild of the grantor, or because the grantor had an affectionate
    regard for grantee on account of the latter's kind and considerate
    regard for grantor. Before such presumption will be indulged, it
    must appear that the grantor reposed special trust and confidence
    in the grantee, and that the grantee had in some manner obtained
    a dominating influence over the grantor. Evidence held insufficient
    to so show.

DEEDS: Validity—Mental Incapacity—Evidence. Evidence reviewed,
2   wherein the mental capacity of a grantor to execute a deed was
    required to be determined from medical testimony, and held insuf-
    ficient to clearly and convincingly show mental incapacity.

*Appeal from Cedar District Court.*—F. O. ELLISON, Judge.

JANUARY 8, 1924.

REHEARING DENIED APRIL 4, 1924.

THIS is an action by part of the heirs at law of Margaret
Shrope, deceased, to set aside a conveyance by her to the de-
fendants of certain real estate, upon the grounds that the gran-
tor was mentally incompetent and that the deed was procured
by undue influence. From a decree dismissing the petition and
quieting title in the defendants, plaintiffs appeal.—*Affirmed.*

*F. J. Casterline & Son, J. C. France,* and *Treichler &
Treichler,* for appellants.

*Johnson, Donnelly & Lynch,* for appellees.

VERMILION, J.—The plaintiffs are grandchildren of Mar-
garet Shrope, deceased. They are the children of her deceased
sons and daughters, who died before she did, and are, as her

1. FRAUDULENT    heirs at law, entitled to a part of her estate. In
CONVEYANCES:    addition to the plaintiffs, she left one son, James.
confidential
relations.       Shrope, surviving her.  The defendants are two
of the five children of James Shrope.  On September 13, 1921,
Margaret Shrope, for an expressed consideration of $1.00 and
love and affection, executed a warranty deed to the defendants
for 180 acres of land in Cedar County, being all the land she
owned.  Plaintiffs bring this action in equity to set aside this
conveyance, alleging that it was procured by fraud and undue
influence of the defendants and James Shrope, their father, and
that, at the time the deed was executed, Margaret Shrope was
mentally incompetent to comprehend the effect of the instrument
upon her property rights and estate.

The defendants by answer denied the allegations of fraud,
undue influence, and mental incapacity, and by a cross-petition
asked that their title to the land be quieted in them, as against
the plaintiffs.  Ray Herbst, named as a plaintiff, filed a dis-
claimer of any interest in the land, denied that he had ever
authorized the bringing of the action or the joining of himself
as a plaintiff, and consented to a decree against him, which was
duly entered in the court below.  From a decree dismissing the
petition and quieting defendants' title, the plaintiffs other than
Ray Herbst prosecute this appeal.

The questions involved are mainly ones of fact.  There is
little, if any, dispute as to the rules of law that must be applied.

Counsel for appellants concede that, if the burden is upon
them to establish affirmatively that the deed was procured by
fraud or undue influence, there is not sufficient evidence to re-
quire a reversal of the case upon that ground.  Their contention,
however, is that the evidence shows that the defendants and
their father sustained such confidential relations with the de-
ceased as to cast upon the defendants the burden of showing that
the transaction was fair, and not the result of undue influence.

The deceased, at the time of the execution of the deed in
question, was nearly 88 years of age.  Her husband, who, during
his lifetime, had owned the land, died in 1870, and thereafter,
she, with her children, continued to live on the farm.  It is ad-
mitted in the pleadings that she acquired the interests of all of
her six children in the land.  Of the children, the three daugh-

ters married and left home at from 20 to 23 years of age, and conveyed their interests in the farm to the deceased in 1881, 1887, and 1895, respectively. One son, Charles, remained with his mother until he was 31, when he married and left. He conveyed his interest in the farm to his mother in 1887. Henry, another son, never married, and remained with his mother until his death, in 1919. James, the only surviving child, and the father of the plaintiffs, married at the age of 27. He lived, for some time after his marriage, in a second house built on the farm, but moved upon another place purchased by him in 1904. The deceased for many years operated the farm, with the help of her children. After Charles and James came of age, she paid them each $200 per year. Later, she rented the farm to James, and this arrangement continued to her death. She seems to have been dissatisfied with the amount of rent she received, and with his operation of the farm in some respects, though what rent he agreed to pay or she actually received, is not shown. Among the assets of her estate is an account against him of $600 for rent. After the marriage of her other children, she and the son Henry continued to live together on the farm, and after the latter's death, she remained there, save for a period of some nine months, when she and a granddaughter lived in rented rooms in Mechanicsville, and the latter attended school. After her son James and his family moved away, various ones of her married grandchildren lived in the other house on the farm, which was only a short distance from her residence, and some of the grandchildren spent more or less time with her. After the death of Henry, and up to some two months before her death, she lived alone, except when some one of the grandchildren was with her, taking care of herself, and doing her own housework. While she suffered from some ailments incident to her advanced age, she seems, prior to her last illness, of about two months, to have been a woman of unusually strong vitality, considering her many years of hard work. In the latter part of August, 1921, she became sick, and a doctor was called. On October 8th, she became much worse, and died on October 21, 1921. The nature of this illness will be referred to more at length hereafter. It will suffice, for the present, to say that her sickness was of a character to, in some degree, affect her mind.

The defendants, William and Forest, were, at the time of their grandmother's illness, aged respectively 27 and 26. During their childhood, and before their father moved from the farm, in 1904, they had both spent about half of their time with her. She is quoted as saying that she raised them. In later years, William stayed with her, from time to time, when he was at home, and Forest occasionally. William was in school in Davenport for something less than a year, and had a position in Iowa City for a year. They both were in the military service, William a year, and Forest for about nine months. The relations between the deceased and the defendants appear to have been most friendly and affectionate. She expressed regret that she did not see them so often during the later years. There is no testimony, however, that either of them ever transacted any business for her, or that they acted as her advisers. She, while an illiterate woman, and unable to write her name, appears to have looked after her own business. She had her own bank account, and drew checks upon it, with the aid of others. At the time of her death, she had deposits in three different banks, aggregating over $2,700, and $1,300 in Liberty bonds.

The day before the deed was executed, William had called by telephone the notary who wrote it, and before whom the deceased acknowledged it, and said that his grandmother wanted to deed her property to Jack (Forest), and asked if he (William) could draw the deed, or if it would be necessary to get an attorney. He was given a blank deed, and told that he could draw it, but that it would have to be acknowledged before a notary. The next day, William asked the notary to come to the grandmother's. Both defendants were at her house when the notary came. Forest, as a witness, says he had William call the notary, and that he believes his grandmother directed that he be called. On the arrival of the notary, the deceased was sitting propped up with pillows in bed. She said she wanted to deed her property to Jack and Willie. She especially mentioned 160 acres and another tract, and handed him three old deeds, and said he could get the description from them. The notary found that there was not sufficient space in the blank deed for the description, and went back to town, where he prepared the deed in typewriting. On his return, she was appar-

ently asleep, but upon William's making a remark to that effect, she said: "No, I am not asleep." She was lying down, but sat up, resting on the pillows. The deed was read over to her by the notary very carefully, he says. She said she could not write her name. The notary wrote her name, and she made her mark, without assistance. At the suggestion of the notary that two witnesses were needed, William called in his sister, Mrs. Miller, and her husband, and they signed the deed, as witnesses to the decedent's mark. The notary, after completing the certificate of acknowledgment, handed the deed to her, and she gave it to William. The notary talked with her a short time about her condition. She said she was not going to get well; that nothing could be done for her; but that she suffered no pain. The notary testified that he had known deceased a good many years, and had transacted some business with her at the bank of which he was cashier; that, on the occasion when the deed was executed, she appeared to recognize him when he arrived, and to fully understand the transaction, and when he returned with the proposed deed, appeared to remember that he had gone to prepare it. There were present at the house on the occasion, during at least a part of the time, in addition to those mentioned, the defendant Forest and one Bickleman, nephew of the deceased, who had been stopping there some weeks. Neither of the latter was in the room where the deceased was, while the deed was being discussed or executed. A Mrs. Herring, who had been employed to assist in caring for the deceased during her sickness, was absent on some errand of her own. There is testimony that decedent had said to Emma L. Shrope, the mother of some of the plaintiffs, that James or his family "thought they would get all her property, but they would slip up on it," and to Bickleman, the nephew, that Jim wouldn't get any of the land; that he worked the land, and thought he would get it, but he wouldn't get any of it; that Jim and the children would not get the land. To Mrs. Herring she said several times that Jack and Willie would get everything she had. Upon Mrs. Herring's asking if she could do that, she replied:

"I don't know as I can; but men who have property do, what they please with it, and I don't see why I can't do as I please with what I have."

While we have not attempted to set out all the testimony, the foregoing is a statement of such facts established by the evidence as are material upon the question of the relations existing between deceased and the defendants. The question is whether, upon these facts, it should be said that the burden is upon the defendants to show that the deed was understandingly made and fairly procured, without the exercise of undue influence.

Where, by reason of confidential relations existing between the parties, arising from kinship or religious, business, or friendly associations, or the greater strength of character, superior ability, or wider experience of one, it appears that the grantor reposed special trust and confidence in the grantee, and the latter obtained a dominating influence over the other, equity casts upon him the burden of showing that a conveyance to him was fairly and understandingly made. *Curtis v. Armagast,* 158 Iowa 507; *Willshaw v. Luick,* 195 Iowa 1402; *Pruitt v. Gause,* 193 Iowa 1354.

The essential thing, the gist of the doctrine, whether it is found in the very relationship itself, as in the case of trustee and *cestui que trust,* and situations where a strict fiduciary relation exists, or arises from any relation of a confidential nature and the surrounding circumstances of the parties, is the presence of a dominant influence, under the impulse of which the act is presumed to have been done. The presumption may arise from various relationships where, from the situation of the parties and the circumstances surrounding them, it appears that one possessed and was in a position to exercise a dominating influence over the other.

The fact of blood relationship is not, in itself, sufficient to raise a presumption of undue influence, except, possibly, in the case of a conveyance from child to parent; but it will depend upon the attending circumstances of relative age, strength of character, dependency, experience, and the like, and the particular facts of their association. This is especially true in the case of a conveyance from parent to child; where the natural instinct of the parent to make provision for the child is recognized as a proper and usual motive for such a conveyance. *Mallow v. Walker,* 115 Iowa 238; *Chidester v. Turnbull,* 117 Iowa

168; *Steen v. Steen*, 169 Iowa 264; *Lavelle v. Lavelle*, 164 Iowa 99; *Curtis v. Armagast*, supra. No fiduciary relation arises out of the relation of grandparent and grandchild. *Kosturska v. Bartkiewicz*, 241 Ill. 604 (89 N. E. 657); *Little v. Little*, 23 Colo. App. 518 (130 Pac. 1022).

As we have said, no business relations of any character are shown to have existed between either of the defendants and the deceased. It does not appear that they ever transacted any business for her or advised her or ever assumed to act for her, unless it be said that they did so in calling the notary to prepare the deed in question. There is no suggestion that she relied upon their advice or counsel, or reposed any special confidence in them in respect to her affairs, or expected them to act for her, unless in this instance and respect. Her relations with them are indicated by her statements to Mrs. Herring that they were always good to her, and did what she asked; that there wasn't anything but what they did for her; and that they never gave her a saucy word. These statements do not appear to refer to business affairs, and no transactions of that character are shown, to which they could apply. She seems to have been speaking of her personal and social relations with them; and what she said would indicate that their obedience and consideration for her wishes had strengthened the affection she would naturally be expected to have for them. The fact that one, by kind and considerate treatment, induces an affectionate regard on the part of another, raises no presumption of fiduciary or confidential relations, as the terms are used in this connection, in the absence of some showing that by this means a dominant influence was obtained by the one over the other. Affection on the part of the donor toward the recipient of his bounty is a most natural, proper, and often an impelling motive for his benefaction. Its operation has never been held to be undue influence, nor its existence, without more, to raise a presumption of undue influence. *Hanrahan v. O'Toole*, 139 Iowa 229; *Clawson v. Webber*, 156 Iowa 704. Where one, by reason of his hold upon the affection, trust, and confidence of another, has obtained a dominating influence over him, the presumption is, however, said to be peculiarly applicable (*Curtis v. Armagast*, supra); but in the present case, there is nothing from which the existence or

operation of a dominant influence on the part of the defendants can be found or inferred. Indeed, the inference might be drawn from the grandmother's statement to the effect that they were good to her, did what she asked them to, and never gave her a saucy word, that she, exercising some of the prerogatives of old age, had continued the process of "raising them," as she described it, beyond their days of infancy. The only instance disclosed by the record where either of them did or said anything respecting the conduct of the grandmother was William's statement that she would not obey Mrs. Herring, the woman employed to assist in caring for her; that she ought to make her obey; and that he had told Mrs. Herring to let her have her own way.

It is true, William told the notary that his grandmother wanted to make a deed to Forest, and, under the direction of Forest, called him to come and take the acknowledgment. They had both been with their grandmother shortly before, and were at the house when he first came, and one of them was present when the deed was executed. These might, in some situations, be considered suspicious circumstances; but, standing alone, they are as consistent with the theory that what the boys did was at the direction of the deceased as that they were exercising a dominant influence over her. Forest, on cross-examination, testified: "I believe that grandmother suggested we have him [the notary] called." There was a motion to strike this statement, because not responsive, a conclusion, and because the witness was incompetent, under Section 4604 of the Code. It is not made to appear that the statement was not responsive, or that the suggestion of the deceased was made to the witness. If the word "believe" was employed in the frequently used sense of "think," as indicating an uncertainty of memory, rather than in the sense of credence upon information, it was not a conclusion. Since it was drawn out on cross-examination, and its vulnerability to the objection is not made to appear, we think it may properly be considered. Its tendency is to greatly mitigate, if not to destroy, any suspicion of dominant influence on the part of the defendants that might arise from their participation in the execution of the deed.

Of course, the mental capacity of the deceased, even though

it is not found to be such as, for that reason alone, to require the setting aside of her conveyance, has a most important bearing on the question of her relations with the defendants and the question of undue influence. We are impressed with the fact that, notwithstanding that she was doubtless suffering from many of the mental infirmities incident to old age, such as forgetfulness and an inclination to dwell much on long past events, while forgetting those of recent occurrence, and was given to frequent repetitions, she yet retained an unusual vigor of mind, for one of her years. That during her last sickness her mentality was, to a greater or less degree, affected by her physical condition, cannot be doubted. This, as we shall have occasion to say later on, was variable; and at times, when her physical condition improved, her mind was also clearer. There is nothing to indicate that, at the time the deed was executed, she was under domination of any sort. We reach the conclusion that no such confidential relations between the deceased and the defendants and no such dominant influence on the part of the latter are shown as will impose upon them the burden of establishing that the deed was not procured by undue influence.

James Shrope took nothing by the deed; and, whatever the relations between him and the deceased may have been, they cannot operate to raise any presumption of undue influence in respect to the deed to defendants. *Baadte v. Walgenbach*, 185 Iowa 773.

Before leaving the question of undue influence, we may say that the record discloses that appellants lost nothing by the concession that, unless their claim of confidential relations and dominant influence should be sustained, the decree could not be disturbed on that ground. What has been said disposes of any contention that the deed was procured by the undue influence of the defendants themselves. No act of James Shrope's is shown from which undue influence on his part could be inferred. There is evidence that the deceased made certain declarations concerning the conduct of James, having, however, no connection with the deed. These statements, in any event, would be no proof of the facts, but mere hearsay. *Johnson v. Johnson*, 134 Iowa 33; *Hughes v. Silvers*, 169 Iowa 366; *Zinkula v. Zinkula*, 171 Iowa 287, 289; *Bradley v. Bradley*, 185 Iowa 1272.

The question of the mental capacity of the deceased to make the conveyance in question must be determined upon the testimony of the physicians. who attended her.   Of the numerous

2. DEEDS: validity: mental incapacity: evidence.

relatives and friends who testified on the trial, no one expressed the opinion that she was of unsound mind, or detailed any facts from which mental incapacity to do the act in question can be found.   The things they observed in her prior to the execution of the deed were but such as would, in the nature of things, be expected in one of her age.   She was growing weaker, physically and mentally; her memory was impaired; she forgot things she said, and repeated; she dwelt on and talked of things of the past, and forgot more recent occurrences.   There is testimony that at times she failed to recognize at first persons with whom she was acquainted, though this was by no means common.   By her own declaration it appears that, at or about the commencement of her illness, she got up in the night, and went out.   She fell, and lay out in the dew all night.   She said she seemed to have a stroke of some kind, and that she did not know why she did it. Whether this was a matter of physical weakness or occurred by reason of mental infirmity, is not clear.   These things of themselves fall far short of showing a lack of mental capacity to make a deed.   *Sutherland St. Bank v. Furgason,* 192 Iowa 1295.

Dr. Priessman had treated the deceased occasionally during the five years preceding her final illness, for digestive disturbances.   He was called to attend her on August 25th, preceding her death, and saw her every day until the 30th.   After an interval of about a week, during which time Dr. Gardener attended her, he visited her twelve times from the 8th to the 23rd of September.   He found her, on his first visit, suffering from dysentery, and what he designates as "intestinitis," with resulting toxemia, "a poisonous condition from the failure of the bowels and kidneys to relieve the system of the poison."   He testified that the effect of this toxic condition was that the brain and mind could not be as active as in its absence.   The digestive trouble cleared up in four or five days, but the toxic condition remained about the same from September 8th to the 23rd.   He described her as very toxic throughout that period, but said that there were times when she was much better; that, when

there was good elimination, she would be better. He took her blood pressure on August 28th and on September 24th, and said it was normal, and that there was no more arteriosclerosis than would be expected in a woman of her age during that period. On October 8th, she suffered a serious relapse, when the failure of the natural processes of elimination resulted, according to this witness, in a marked increase in blood pressure and hardening of the arteries. She was in a semiconscious state, and so continued, as we understand, till her death, some 13 days later. The doctor further testified that she was very undecided and changeable; and expressed the opinion that a person of her age and in her condition could be easily influenced. Referring to the date of the deed, he gave it as his opinion that she knew her property and its value, possibly. He said:

"Yes, I think she would understand,—probably would; but whether the state of her mind was clear enough,—whether she understood just what she was doing or not,—that is a question. Whether, we mean, she was so undecided she would not know what she wanted to do."

He testified that she always recognized him and appeared to recognize others, and to understand what was going on.

Dr. Crawford visited the deceased on September 23d. He testified that her system was not expelling properly, and she was very much poisoned; that it was manifest that the poison had affected her mentally. Whether on that day she was in such condition as to comprehend the value of her property and her obligations to her relatives, he said, would be a very difficult question to answer; but that one in such a state as she then appeared would not be qualified to do such things. In answer to hypothetical questions based on the facts subsequently shown as to her conduct and conversation at the time the deed was executed, he stated that her mind must have been clearer then than when he saw her.

Dr. Gardener had treated the deceased a few times before her last illness, for digestive trouble and constipation, and visited her on September 14, 1921. He testified that she was then suffering from toxemia, and that the effect of that condition upon the mind of a woman of her age would be depressing, and would tend to weaken the mental powers. He expressed the

opinion, based on his previous knowledge of her condition and his examination on that day, that it would be very questionable whether, on the day previous, she was capable of comprehending the nature of her property and her obligations to her family. Dr. Bird had prescribed for her in 1920, when she complained of constipation. His treatment was to relieve that condition, and also high blood pressure.

Dr. Hejinian was called in consultation on October 9th. He testified that she had a marked hardening of the arteries,— arteriosclerosis,—a condition that came gradually,—not at once,—and that, in one of her age, would take a good many years to reach the stage he found. He found her suffering also from nephritis,—inflammation of the kidneys,—and myocarditis,—inflammation of the heart tissues,—congestion of the lungs, and dropsy; and said that a toxic condition was present for a long time in connection with the kidney trouble, and that the elimination was very poor. He expressed the opinion that, four or five weeks before, she was not able, judging from the condition in which he found her, and if she was progressing like other cases, to do any kind of work of importance. He testified that toxemia has a weakening effect on the various organs of the body, including the brain; that arteriosclerosis has a bad effect on the brain,—the patient becomes senile; that the average person 88 years old, where the organs are normal, would have arteriosclerosis, more or less; that disease of the heart with nephritis would increase the arteriosclerosis very much; that, with arteriosclerosis, as a rule, there is trouble with kidneys, and in these cases, as a rule, they have hardening of the arteries and muscles of the heart to some extent; and that these all tend to more or less affect the tissues of the brain; and that long continued costiveness would have the same bad effect. In answer to hypothetical questions describing the transaction of the execution of the deed, he said:

"If she did these things of her own volition, being an intelligent transaction, knew what she wanted done, the property she wanted to dispose of, and to whom she wanted to deed it, then she was in a different condition than when I saw her. If she was in the physical and mental condition I found her in,

she might have done those things under suggestion, without comprehending her acts in the matter.''

The fair conclusion to be drawn from this testimony is, we think, that she was suffering from ailments the effect of which would be to materially weaken her mentality. The extent to which this had progressed at the time of the execution of the deed is a matter extremely difficult to determine. The deceased was undoubtedly in much worse state, both physically and mentally, when Dr. Hejinian saw her, than she had been during the weeks just previous. His opinion as to her previous condition is based entirely upon his observation of her on the one occasion, and the usual course of the disease. The testimony of the other physicians indicates that this had not been such as he would have expected. The two physicians who saw her near the time that the deed was executed say no more than that, in their opinion, it was doubtful whether she possessed sufficient mentality to understand the nature and consequences of her act. They all seem to base their conclusions as to her mental capacity more upon their observations of her physical condition and the recognized effect of such conditions upon mental functions than upon any observed manifestations of mental weakness. The testimony of the physician who saw her most frequently and was in the best position to discover evidences of mental decay— and of the others as well—is barren of any fact, any act, statement, or omission, indicating that the mental weakness which they say would result from or accompany her physical infirmities was, in fact, apparent. It is not the intention to say that their conclusion that an observed physical impairment would be accompanied or followed by certain mental deterioration is not admissible, or is not entitled to weight, but merely to point out that their testimony fails to disclose any fact showing that that result had, in fact, been produced, or the extent of such mental weakness. There was no failure to recognize such of them as she knew; she appreciated her condition and the efforts being made on her behalf. It appears that, during her sickness, and prior to her relapse on October 8th, she was up part of the time, and would dress herself. She was better at times, and stronger, both mentally and physically. She talked intelligibly and upon various subjects. We have already referred to the testimony of

the notary as to what occurred at the time the deed was executed. He appears to have been a disinterested witness, and there is nothing to suggest that he is not worthy of credit. Bickleman, who was at the house at the time, though not in the room, testified to overhearing some things said on that occasion which, if true, would not only be contradictory of the notary's testimony, but would put the transaction in a different light. His testimony as to the condition of the deceased also portrays her as much more feeble, both mentally and physically, than do even the plaintiffs themselves. Without going into details, we may say that he is contradicted by witnesses apparently candid and disinterested, and there is much in his record to indicate that he is entitled to slight credit.

The plaintiffs have the burden of establishing the mental incapacity of the deceased, and this they must do by proof that is clear, convincing, and satisfactory, before her deed can be set aside on that ground. *Sutherland St. Bank v. Furgason,* supra, and cases cited. As we have said, if this issue is determined in plaintiffs' favor, it must be upon the testimony of the physicians who attended her. We are not convinced that their testimony establishes such mental weakness as to require that her deed, executed in accordance with her previously expressed intention, and under circumstances so strongly indicating that she understood the nature and consequences of her act, should be set aside. This is a case where the appearance of the witnesses and their manner of testifying would be of considerable aid in determining the credit to be given to their testimony. We must determine the issues *de novo,* and upon the record, and this we do; but the fact that the trial court, with that advantage, reached the same conclusion, is entitled, as has often been said, to some consideration.—*Affirmed.*

PRESTON, STEVENS, and DE GRAFF, JJ., concur.