U. S. SCOTT, Trustee, Appellant, v. HUGH F. SEABURY, Appellee.

No. 43028.

OCTOBER 15, 1935.

See, also, 216 Iowa 1214, 250 N. W. 468.

Heinrich C. Taylor and T. A. Goodson, for appellant.

J. A. Williams, and Buell McCash, for appellee.

MITCHELL, J.—U. S. Scott, appointed trustee of the property of Bell Seabury upon her ex parte application on or about June 25, 1932, instituted this action in equity to set aside an assignment of a $6,000 mortgage, upon which there was a balance due of $5,000. The relief sought by plaintiff appellant was based on the charge that the assignment was obtained by the grandson of Bell Seabury, Hugh F. Seabury, who is the defendant appellee, without consideration and by undue influence; that the defendant obtained assignment of the mortgage and note shortly after the death of his father, the only son of Bell Seabury; and that Bell Seabury at said time was mentally weak as a result of old age, worried and inexperienced in business affairs, and did not know that she was parting with title thereto. The defendant denied the alleged want of consideration, undue influence, the mental incompetency of Bell Seabury, and set up as a defense the annuity contract as adequate consideration for the assignment in question. A great deal of evidence was offered and more than a week was consumed in the trial of the case. The lower court denied the relief sought by plaintiff, allowed the transfer of the mortgage and note to stand and entered a permanent injunction, restraining Hugh F. Seabury from disposing of the note and mortgage during the lifetime of Bell Seabury, and dismissed plaintiff's petition. From such finding and decree appellant, Scott, the trustee of the property of Bell Seabury, has appealed to this court.

This is one of those unfortunate cases in which members of a family are aligned against other members of the same family. Bell Seabury at the time of the transfer was 76 years of age. She had been married to Oscar Seabury and there were born

to said couple three children—Carrie Neal, Sophia Seabury, and Frank or F. R. Seabury. Bell Seabury and her husband had considerable trouble during their married life, and she had been twice divorced from her husband. The first divorce was granted back in 1913 on the ground of cruel and inhuman treatment. There was evidence in the record in regard to the trouble she had had with her husband at that time. No good could be accomplished by setting it out in this case. She was granted a divorce and her husband appealed from that decision. However, before an opinion was handed down in that case they had mutually effected a reconciliation and petitioned the Supreme Court of Iowa to set aside the first divorce decree and judgment for alimony, that they might again resume the relationship of husband and wife. This relief was granted and an order was so entered. But it was not long until there was trouble again in the home, and on September 20, 1917, Bell Seabury again filed suit for divorce on the same grounds, seeking also alimony. Again there was a trial, and the lower court granted the relief she asked, on October 19, 1918, decree being entered, granting Bell Seabury a divorce and awarding to her $9,500 in alimony. Bell Seabury and Oscar Seabury then went their several ways and were never thereafter reconciled. As is so often the case, the daughters, Carrie Neal and Sophia Seabury, sided with the father, and the son Frank (the father of appellee, Hugh F. Seabury) cleaved to his mother. The record clearly shows that from that time on the son and the daughters had nothing to do with each other; a bitterness had developed between them that even time itself did not change.

Bell Seabury, after the second divorce was granted, went to live with her son. The first wife of Frank R. Seabury had been committed to Mt. Pleasant State Hospital for Insane, leaving behind two small children, Hugh F. Seabury, then aged seven years, and Iris Seabury, a younger sister. Some time thereafter Frank Seabury married a second time, taking as his spouse Mildred Seabury, his surviving widow. After her son's remarriage, Bell Seabury spent part of the time at her son's home and part of the time she lived alone, until in 1928 she became a permanent member of her son's family and resided there up until the time of his death.

With the proceeds from her divorce proceedings Bell Seabury, in February of 1920, loaned her son $6,000 and took the

mortgage in question on 120 acres as security for said loan. $1,000 had been paid upon the principal, and there was left a balance owing of $5,000.

She lived with her son and his family up until the time of his death in June, 1932. A very close and friendly relationship existed between the mother and son, and the members of his family. Naturally Frank advised his mother in regard to business transactions, but it appears that she handled her own money; had her own safety deposit box in which she kept separately her papers. Her former husband, the father of her son and daughters, died several weeks before her son died. He had lived with his daughters and had had no contact with his former wife.

The son of Frank Seabury, Hugh F. Seabury, Bell Seabury's grandson, had been very close to his grandmother. She had lived in the home with him, had taken a great interest in his work, and had contributed the sum of $600 that he might secure a college education. In 1928 Hugh married, leaving his father's home and starting in upon his chosen profession, that of a teacher. But the friendly relationship between the grandmother and grandson continued.

On the morning of June 10, 1932, three days after Frank R. Seabury's funeral, while his son was in the yard of his father's home and talking to his wife and stepmother, his grandmother came to the door and called him into the house, saying she had something to speak to him about. He complied with her request, and she then asked him if he knew she had a mortgage on his father's farm. He replied that he did not. She advised him that she was going to turn over this note and mortgage to him, and that he would have to pay her the sum of $100 per year, and she asked him to go with her to the bank that she might get her papers out of the safety deposit box. He complied with her request. They went to the bank and secured the papers. There was some discussion about certain of the papers in the box not pertaining to the note and mortgage involved in this case, and then she asked him about a lawyer to make out the proper transfer of the mortgage and note. Hugh suggested the name of one of the lawyers in town but his grandmother replied that she was going to go to Mr. Fimmen, who was a friend of her deceased son Frank. She went to Mr. Fimmen's office alone and there told him what she desired to do. The question came up as to the amount of the annuity which her

grandson should pay her and it was decided that the amount should be $200 instead of $100. Hugh Seabury later came to the office and was informed of the talk that his grandmother and the attorney had had, and he said he wanted time to think it over and to advise with some of his friends. Mr. Fimmen was to prepare the contract and they were to return at a later date. The note and mortgage were left with the attorney. After they arrived home that evening there was a family council, and later in the evening Hugh Seabury consulted with some of his friends as to whether or not he should enter into the agreement proposed. On the following day Bell Seabury and Hugh F. Seabury again visited the office of W. R. Fimmen, who had been unable to complete the contract, and they waited some time while it was being prepared. The contract was then read aloud by the attorney, and executed by Bell Seabury and Hugh F. Seabury, and a copy delivered to each one of them. The mortgage and note were properly indorsed and the assignment placed of record on June 11, 1932. The contract which Hugh Seabury entered into with his grandmother, which was prepared by her attorney, provided for the payment by Hugh to his grandmother of the sum of $200 yearly during her lifetime.

After this transaction Bell Seabury stated to Mr. Fimmen that she desired to prepare a new will, for she had other property than the mortgage and note involved in this case, and thereupon Hugh Seabury withdrew from the room and the attorney prepared the will in compliance with her request. One of the witnesses to the will was Dr. Charles D. Shelton, who afterwards testified on behalf of the appellant as to an examination he had made of Bell Seabury in 1934, but, it is interesting to note, he did not express an opinion in regard to her mental condition at the time that she assigned the mortgage and note in question.

Some time thereafter the daughter, Sophia Seabury, and the mother, consulted with an attorney and an application, under section 12617 of the Code of Iowa, for appointment of a trustee for her property, was filed. U. S. Scott was appointed trustee, and immediately commenced this action.

The first claim of the appellant in this case is that a fiduciary relationship existed between Bell Seabury and Hugh Seabury, and where such relationship is found to exist, the burden of proof is upon the donee or vendee in such transactions in

respect to the bona fides. Vorse v. Vorse, 186 Iowa 1091, 171 N. W. 186; Steen v. Steen, 169 Iowa 264, 151 N. W. 115.

▐▐▐ And so we must look to the record in this case to ascertain the facts, keeping in mind the fact that this court has held time and again that mere blood relationship is not of itself sufficient to raise a presumption of implied or constructive fraud in such situation. Roller v. Roller, 201 Iowa 1077, 203 N. W. 41; Arndt v. Lapel, 214 Iowa 594, 243 N. W. 605.

Bell Seabury went into the home of Hugh Seabury when he was but a small boy. He had been deprived of the guiding hand of a mother and the grandmother undertook to fill that important position to the best of her ability, and that she did not fail in this attempt is proved by the fact that there was a strong bond of affection between the two. Back in 1925 the appellee left home to attend college. During the time he attended college he spent his summer vacations with his grandmother, but in the year 1928, having graduated, he married and established his own home, living in different cities where his profession took him. From 1928 to 1932 he saw his grandmother only occasionally, when he visited at home. He knew absolutely nothing about her business or her property, and had never been consulted by her in regard to any business matter until the morning that she told him about transferring the note and mortgage involved in this case. There is nothing in this record to show any confidential or fiduciary relationship existing between the grandmother and the grandson. Nor is there anything to show that he attempted to or did take any unfair advantage of her. She selected her own lawyer. She went alone to the office of this lawyer and advised him what she wanted done. After the discussion between Mrs. Seabury and her attorney, Hugh Seabury came to the office and the matter was again talked over. He told his grandmother and her attorney that he desired to consult with some of his friends and advisors before he entered into the arrangement. He was not in any hurry to consummate the deal. Rather was he desirous of ascertaining whether it was an advisable transaction to enter into. He did not at any time advise his grandmother or direct her what to do. The plan of disposing of this note and mortgage was Bell Seabury's and not Hugh Seabury's. She was arranging for her care and keep for the rest of her life. In her grandson she had great faith, and

by this arrangement she was binding him to contribute to her support during the rest of her lifetime.

■■■ Where no confidential relationship of fiduciary nature existed between the parties, the burden of proving that the contract was induced by fraud, actual or constructive, duress or undue influence, rests upon the party attacking it, who must establish the same by clear, convincing, and satisfactory evidence in every particular, as fraud is not presumed. Sutherland State Bank v. Furgason, 192 Iowa 1295, 186 N. W. 200.

■■■ It is the claim of the appellant that there was such inadequacy of consideration in the case at bar as to be regarded as evidence of fraud. The mortgage which was transferred in consideration of the annuity contract entered into was for $6,000, upon which there was a balance due of $5,000. This mortgage was a first lien on 120 acres. The maker of the note was dead, and the only chance of receiving payment was out of the security. So the value of the mortgage depends upon the value of the security, to wit: the 120 acres.

We must remember that this transaction took place in June of 1932, when values of farm products and farm lands in Iowa had reached the lowest level in twenty-five years. There was no way that mortgages could be renewed. Insurance companies and banks were not making new loans. Foreclosures were crowding the courts and there was little, if any, real estate moving. There is a conflict in the evidence, as there always is, in regard to the value of the land. It varies from approximately $3,000 to a little more than $5,000. It is doubtful if in 1932 this land would have produced sufficient to have paid the taxes, upkeep, and annuity. Certainly no one could say that there was such an inadequacy of consideration in this transaction as to show fraud or unfair dealing. The contract which Hugh Seabury entered into binds him to pay $200 per year during his grandmother's lifetime. In consideration for this, he received a mortgage, the value of which at the time he received it was nowhere near the face of the mortgage. He is a school teacher, earning approximately $2,000 a year. He has tendered the amount which he has agreed to pay. The lower court entered a permanent injunction, restraining him from disposing of this note and mortgage during the lifetime of his grandmother.

A careful reading of this record convinces us that there was an adequate consideration for the transfer of the note and mort-

gage. The able and distinguished trial court listened to the evidence during an eight-day trial. He had an opportunity to observe the witnesses and the parties, and to form a correct opinion, not only from the evidence which was written and spoken, but also upon the indefinable something which associates itself with every person and reveals in gesture, facial expression, and the tonal quality of voice the hidden motives.

In a case of this kind Mr. Justice Sherwin, in Swartwood v. Chance, 131 Iowa 714, 716, 109 N. W. 297, 298, said:

"We have read the record in this case with care and are convinced that it wholly fails to show the mental incapacity necessary to avoid the deed. In addition to our own judgment we have the judgment of the trial court, who saw and heard the witnesses presented by both parties, and who was thereby better able to weigh their testimony than we are from a consideration of their printed words alone. While the case is triable de novo here, we cannot overlook the fact that a judge gains much by seeing and hearing the witnesses used by the respective parties. See Johnson v. Insurance Co., 126 Iowa 565, 102 N. W. 502."

Judgment and decree of the lower court must be, and it is hereby, affirmed.

KINTZINGER, C. J., and ANDERSON, HAMILTON, POWERS, PARSONS, and DONEGAN, JJ., concur.