ANNA ARNDT, Appellee, v. ELLA LAPEL, Appellant.

No. 41316.

JUNE 24, 1932.

Musmaker & Musmaker, for appellee.

R. W. Cockshoot and Swan, Martin & Martin, for appellant.

GRIMM, J.—The petition in this case was filed in February, 1931. It alleges, in substance, that the plaintiff is the widow of Fred Arndt, who died March 23, 1930, and that the defendant, Ella Lapel, is his daughter and sole heir at law. For brevity, Fred Arndt, the deceased, will hereinafter be called the "grantor."

It is claimed that the plaintiff obtained title to the quarter section of land involved, by virtue of a warranty deed from said Fred Arndt, the former owner, and that the daughter, Ella Lapel, makes some claim to the real estate. The daughter answered by way of general denial, and further states, in substance, that prior to November, 1918, the grantor and the defendant, his daughter, were the best of friends and relied upon each other for counsel and advice; and that in November, 1918, the plaintiff, then Anna George, and the grantor, arranged to be married. The defendant was not invited to the marriage, and from that time on, it is alleged, the plaintiff, formerly Anna George, now Anna Arndt, sought, by every means, to alienate the affections

of father and daughter and to influence the grantor against his daughter, Ella Lapel.

It is alleged that in July, 1929, the grantor had an attack of sickness in the nature of a slight stroke, that in September, 1929, he had a second stroke, as a result of which he was taken to his bed in October, 1929.

It is alleged that by undue influence and improper persuasion, plaintiff secured from said grantor, ·in 1929, the warranty deed in question. It is alleged that the execution of the deed was kept from the defendant until after the death of the grantor. It is claimed that the grantor endeavored to have the deed and other papers which he had executed returned, and that the grantor was of unsound mind at the time of the execution of the deed, and that the deed was procured by undue influence and duress.

By way of a reply, the plaintiff alleges that at the time of their marriage, on November 26, 1918, the grantor had purchased, on contract, a half section of land, including the quarter section in controversy, and that he was still indebted thereon in the sum of $18,000. It is alleged that the plaintiff, from time to time, advanced, with interest, the sum of $15,000, which money was used in the main, in cancelling the contract on the land. It is alleged that prior to the time said advancements were made, said grantor. represented to the plaintiff that he would convey to her the 160 acres of land in controversy.

By a subsequent amendment to the answer, the defendant claims that as a part of the said transaction in which the deed was procured, the grantor was induced to make a will; that the deed was testamentary in character, and no sufficient delivery of the same was ever made, to show a contrary intent.

It is alleged that the said will was revoked on the 4th day of March, 1930, and that the revocation included the deed.

The trial court quieted the title to the quarter section of land in controversy in the plaintiff, and the defendant appeals.

The record in this case is quite lengthy, about 35 witnesses having been examined. We shall not attempt to set out, or even refer to, all of the evidence, but will only refer to sufficient of the evidence to indicate, in a most general way, the positions taken by the parties and some of the proof in relation thereto.

At the time of the death of the grantor, on March 23, 1930,

he was about 70 years of age. The defendant, Ella Lapel, at the time of the trial, was 49 years of age, and the only daughter of the grantor. She was married when she was 22 years of age. She was educated and taught school and thereafter married. It is quite apparent from the record that the marriage was not considered a satisfactory one. She at one time brought suit against her husband for divorce, but afterwards dismissed the action. The grantor apparently took a dislike to him. At the time of the trial, the defendant was engaged in the millinery and dry goods business. She had been thus engaged for approximately 15 years.

Prior to November 26, 1918, when the grantor married the plaintiff herein, he had been a widower for a number of years. He lived only two and one-half blocks from the home of the defendant, and the father and daughter were, during all that time, very closely associated with each other. While they maintained separate homes, they were back and forth together a great deal. The father came to the store in the mornings and built the fires and emptied the ashes for the daughter and did various other kinds of work around the place, purely as a kindness to his daughter. On the other hand, the daughter assisted the father at his home by doing his washing, ironing, and mending, renovating his house, and otherwise similarly assisting him. The father took care of his daughter's minor child, Agnes, while the daughter worked in the store. Without further expression of details, it may be said that the father and daughter were unusually fond of and kind to each other and much in each other's company prior to the time of the second marriage of the grantor.

Anna George lived in the first house north of the grantor's home. They became engaged and subsequently married, and, as previously noted, the daughter was not invited to the wedding. From that time to the time of the grantor's death, there was more or less trouble between the plaintiff and the defendant. There were intervals when peace was patched up, but in the main, there were smouldering envies and jealousies between the two women, and the grantor was between two fires.

In the summer of 1929, the grantor began to fail in health. It is the contention of the defendant that he had been ill at various times and a physician had been called, but the defendant was not advised of the situation. The first illness was in

July, 1929. It is claimed that this spell of "dizziness" resulted in a partial impairment of the use of his right arm, and to some extent affected his eyesight. About the 16th of October, he had another spell in the nature of headache, nervousness, inability to sleep, pain in the back of his neck and dizziness. On October 19, 1929, he collapsed in his house with apparently what was diagnosed as an epileptic fit. He was confined to his bed only a short time and on October 21, 1929, was sitting up in a chair. On that date, a local lawyer prepared the deed in question and the will. The deed was signed by the grantor, with his mark, and witnessed by the lawyer and one Bailey, who chanced to call at the home at that time. The acknowledgment was taken by the attorney. As originally drawn, the will recited that the testator owned a half section of land, describing it. The will also contains the following: "* * * and in connection with this will, I am deeding to my beloved wife, Anna Arndt, the first quarter above described in fee simple except a reservation of a life estate therein for myself."

The "first quarter," above referred to, is the quarter section involved in this case.

The will also bequeaths to the wife all personal property, out of which she is expected to pay all charges, except the mortgage indebtedness. The grantor then deeded to Anna Arndt, in trust, for the benefit of his daughter, the other quarter section, "to be so held by my said wife for a period of fifteen years from the date of this will, or until my said daughter may become a widow, at which time, if such shall occur before the fifteen years has elapsed, said quarter section shall become vested in and be the absolute property of said Ella Lapel, in fee simple."

At the time the deed was executed, a discussion arose about the length of time the trust for the defendant should run, and the grantor finally concluded to change the period of the trust from fifteen years to ten years; and the will, as first drawn, was destroyed, and a second was drawn, fixing the period at ten years, which said latter will was executed the next day after the deed was executed.

The deed was delivered to the plaintiff, but she did not place it of record until after the death of the grantor.

Apparently, no physician was called for the grantor from the 19th of October, 1929, until November 25, 1929, except that,

beginning on October 31st, the grantor had a number of treatments from a chiropractor. The local family physician called to see him on November 25, 1929, and at various intervals from then until February 12, 1930. At that time, he had an attack of the flu, and the local physician called to see him practically every day until March 15th, when he was removed to the hospital at Des Moines, where he died March 23, 1930.

On March 4, 1930, the defendant asked one Henry F. Miller to go over to the grantor's house. The grantor was then in bed. Miller had known the grantor for a quarter of a century and frequently visited at the house. On this particular afternoon, Miller found the plaintiff and the defendant and the grantor in the grantor's home. After a few minutes, the grantor directed Miller to get Dr. Green, who was the local physician, and Mr. Launder, a lawyer, to come to the house. Miller complied with the request, and, after some delay, the doctor and the lawyer arrived. Unfortunately, Mr. Miller, as he says, was "getting kind of hard of hearing," and he was not able, on that account, to hear distinctly what was said between the parties, but testifies, among other things, as follows:

"Mr. Arndt said he would like to have his papers changed. * * * Mr. Launder (the lawyer) sat down and took a piece of paper and changed the will. Mr. Launder didn't have a typewriter there. He just wrote it by hand. As near as I could understand the conversation, Mr. Arndt wanted to get his will changed some way."

The document which was there prepared is as follows:

"Fontanelle, Iowa, March 4, 1930.

"I, Fred Arndt of Fontanelle, Iowa, having heretofore executed a last will and testament, hereby revoke the same, meaning and intending to revoke any and all wills heretofore made by me leaving my property go according to the laws of Iowa.

his<br>
"Fred  X  Arndt.<br>
mark

"Witnessed by:
"Henry F. Miller,
"W. H. Green."

It was turned over to Mr. Miller and he kept it in his possession until he was called as witness on the trial of this case and delivered it to be introduced as an exhibit.

The foregoing does not comprise all of the facts, but it is a general outline of the story of the case.

Many complaints are made by the appellant.

I. One of the contentions of the appellant is that "the court erred in not finding from the facts that a confidential relationship existed between Anna Arndt and Fred Arndt, thereby putting the burden upon Anna Arndt to justify the deed."

This question lies at the threshold of a proper determination of the case. The record contains but little evidence directly bearing on the subject. Appellant's argument deals largely with some statements alleged to have been made by the grantor prior to his second marriage, to the effect that he intended to give the home quarter section (the one in controversy) to his daughter, Ella Lapel; that after the grantor's second marriage, his attitude towards his daughter changed very noticeably.

It is then contended that because Mrs. Arndt was constantly at grantor's bedside, or near him in the room where he sat, or present when visitors called, and assisted him in signing the deed, and similar acts on her part, therefore there was a confidential relationship between them, such as is contemplated by law.

It is also claimed that while the grantor had been formerly a very talkative man, he had little or nothing to say on these occasions when the deed and will were executed and when the will was revoked.

Reference is made to the fact that the trust provision in the will is similar to a provision in the will of the father of Mrs. Arndt.

It is also contended that the plaintiff transacted business for the defendant, and that at times the grantor complained that he could not get his papers back, and at times stated, in effect, that his wife had caused him to do certain things about his property.

A very careful reading of the entire record on this subject discloses that the grantor was a strong-willed, positive German character. Prior to his illness, he was talkative. It appears that the statements by which it is claimed the grantor was dis-

satisfied with "his papers" and statements concerning the plaintiff's alleged domination over him came late in life and months after the execution of the deed, at a period when the grantor was at times delirious and at other times entirely rational.

Quite naturally, the plaintiff transacted the grantor's business for him, even to the extent of signing checks, because he had, to a greater or less extent, lost the use of his right arm.

We find nothing in the record which warrants a finding that a confidential relationship, such as is contemplated in the law, arose between the parties. Necessarily, each case of this character must depend upon its own facts.

Upon this record, we do not find that the grantor had surrendered to his wife the control of his business in such a way as to establish a fiduciary relation within the meaning of the law. There is in the record no evidence that prior to the date of the execution of the deed, the plaintiff had taken over the transaction of the grantor's business. Very shortly before his first "dizzy" spell, he had gone to the county seat for the purpose of paying his taxes. It is true that his wife went along, but in that there is nothing abnormal. When the time came for the execution of the deed, the record discloses that a Mr. Bailey, who had been acquainted with the grantor for a period of ten or eleven years, called at the home, as he had frequently done. He was called in by the plaintiff and asked to witness the grantor's signature to the deed, which he did. The attorney who also witnessed the deed and took the acknowledgment was present. The grantor was sitting in a rocking chair. Bailey testified that the grantor was then of sound mind and understood what he was doing. Bailey testified, among other things, as follows:

"Mr. Launder (the attorney) explained to me, in the presence of Mr. Arndt (the grantor), what the papers were that I was signing."

Apparently, Bailey witnessed the first will, which was subsequently destroyed, in order that a new one in which the trust period was changed from 15 to 10 years might be executed. This second will was witnessed by the attorney and Nettie Heiser.

What constitutes a confidential relationship has been re-

cently passed upon by this court in Utterback v. Hollingsworth, 208 Iowa 300. We quote the following, l. c. 302:

"Plaintiffs take their main position on the proposition that defendants sustained to decedent a confidential relationship, such as to shift to them the burden of proof. It is not claimed, of course, that the relationship was fiduciary, as matter of law, but that it existed in fact, within the doctrine of Curtis v. Armagast, 158 Iowa 507; Pruitt v. Gause, 193 Iowa 1354; 2 Pomeroy's Equity Jurisprudence (4th Ed.), Section 956. This doctrine, for the purpose of the matter now under discussion, may be stated to be that one who in fact stands in a confidential relationship to another may not retain advantage of a transaction with the *cestui que trust* which may reasonably be the result of the confidence reposed, unless he shows that the *cestui* acted with freedom, intelligence, and full knowledge of all the facts. The purpose of the doctrine is to defeat and correct betrayals of trust and abuses of confidence. It is a prerequisite to the application of the doctrine that faith and confidence be reposed; that the repository shall be thereby in a position of superiority or dominance, while the *cestui* is in a corresponding position of inferiority or subservience. * * * Before the doctrine can be applied, however, the existence of the confidential relationship or the facts giving rise to it must be proved. The relationship must be such as to enable the one charged with having abused it to have exercised it to his advantage. It must appear expressly or by implication that trust or confidence was reposed. The supposed trustee must be shown to have been in a position of advantage or superiority such as to imply a dominating influence over the *cestui*. Albaugh v. Shrope, 197 Iowa 844; Bradley v. Bradley, 185 Iowa 1272, 1279; Nixon v. Klise, 160 Iowa 238, 244; Krcmar v. Krcmar, 202 Iowa 1166, 1171; Shaffer v. Zubrod, 202 Iowa 1062; McNeer v. Beck, 205 Iowa 196."

There is nothing in this record to show that the grantor reposed any faith and confidence in the plaintiff, at least to the extent that he sacrificed his own ideas to hers. Whatever may have been his condition in the last few days of his life, at the time he had delirious spells, the fact remains that up to the time of the execution of the deed and for some time thereafter

the grantor was a man of positive character, who had definite ideas and apparently found pleasure in expressing them. There is no showing that anyone had taken over his affairs in such a sense as to constitute a confidential relationship.

As was said in McNeer v. Beck, 205 Iowa 196, l. c. 198:

"Mere blood relationship does not, of itself, create the legal trust or confidential relationship and change the requirement in the above regard. Krcmar v. Krcmar, 202 Iowa 1166; Shaffer v. Zubrod, 202 Iowa 1062."

Moreover, the mere fact that the plaintiff and the grantor were wife and husband does not, of itself, create a legal trust or confidential relationship.

It will later, in other branches of this opinion, be shown that the grantor had various reasons in mind for doing what he did in the execution of the deed and the will.

Upon the whole record, we find that the grantor had not surrendered to the plaintiff the control of his business in such a way as to establish a fiduciary relationship within the meaning of the law.

II. It is next contended by the appellant that the grantor was so mentally weakened at the time that the execution of the deed was in fact the act of his wife and procured by her undue influence, and that the court erred in not finding from the facts that undue influence would be inferred.

This court has, in the recent case of Worth v. Pierson, 208 Iowa 353, l. c. 359, reaffirmed the expression of this court in In re Estate of Mott, 200 Iowa 948, as follows:

" 'Influence, to be undue, within the meaning of the law, must be such as to substitute the will of the person exercising the influence for that of the testator, thereby making the writing express, not the purpose and intent of the testator, but that of the person exercising the undue influence. It must be equivalent to moral coercion, must operate at the very time the will is made, and must dominate and control the making of it. Henderson v. Jackson, 138 Iowa 326; Parker v. Lambertz, 128 Iowa 496; Perkins v. Perkins, 116 Iowa 253; In re Will of Richardson, 199 Iowa 1320. The person charged with the exercise of undue influence need not be personally present. Brackey

v. Brackey, 151 Iowa 99; In re Will of Busick, 191 Iowa 524.
Undue influence is not established by proof of opportunity to
exercise it. Importunity, request, and persuasion that do not
go to the point of controlling the will of the testator are not
enough, nor is it established by proof of opportunity and dis-
position so to do. Zinkula v. Zinkula, 171 Iowa 287; Sutherland
State Bank v. Furgason, 192 Iowa 1295; In re Estate of Town-
send, 128 Iowa 621. It is apparent, therefore, under these rules,
that opportunity and disposition, plus persuasion and impor-
tunity, are not sufficient to take the question of undue influence
to the jury. Contestants must go further than this, and show
not only the existence of the facts, but that said undue influence
existed, and controlled the maker of the instrument in the dis-
position he made of his property, substituting the will of the
person exercising the influence for the will of the person making
the writing.' In re Estate of Mott, 200 Iowa 948.''

See, also, Wolfe v. Shroyer, 206 Iowa 1021; Wackman v.
Wiegold, 202 Iowa 1391; In re Estate of Cooper, 200 Iowa 1180;
Cookman v. Bateman, 210 Iowa 503, l. c. 507.

It will be recalled that numerous checks were introduced
in evidence, bearing dates from April 29, 1920, to October 1,
1926, in which Mrs. Arndt turned over to the grantor sums of
money ranging from $110 to $4,264, in round numbers, which
latter check was dated April 29, 1920. On July 2, 1920, a
check for $2,512 was given by Mrs. Arndt on her account to the
grantor. The sums shown by these checks amount in the ag-
gregate to $8,865.23.

It quite satisfactorily appears from the competent evidence
in the case that at least a very large part of this fund was used
by the grantor in making payments on the contracts by which
he procured title to the entire half section, one half of which is
the home or north quarter section in controversy. It is claimed
that an aggregate of $15,000, principal and interest, was thus
advanced by the plaintiff to the grantor.

When the deed and the will were made, the will specifically
stated that he had deeded the home place to his wife.

The history of the case quite clearly discloses that the
grantor did not have a very high opinion of the defendant's
husband. It clearly appears he had expressed himself to the

effect that he did not intend that her husband should ever have a dollar of his money. As previously indicated, it appears in the record that the defendant had at one time brought suit for a divorce against her husband. This, in and of itself, is sufficient background for the feeling of the grantor against her husband. The fact that in the will the south quarter section was deeded in trust for the use and benefit of the defendant, the trust to cover a period of 15 years (in the final draft 10 years), "or until my said daughter may become a widow," corroborates the persistency with which the grantor sought to prevent the defendant's husband from participating in any of the grantor's property.

While it is not claimed that these advances were made by the plaintiff to the grantor under any contract or agreement that the home place or any other property would be deeded in exchange therefor, or that the money would be paid back, nevertheless, the fact that so much money was advanced by the plaintiff to the grantor and used by the grantor in paying the purchase price of the entire half section, furnishes a persuasive reason why the grantor desired and saw fit to make the deed in controversy. The feeling of the grantor towards the defendant's husband furnished a sufficient reason for the execution of the will, in terms as hereinbefore described.

Approximately five months after the execution of the deed and the will, and on March 4, 1930, the will was revoked by the instrument hereinbefore set forth. This occurred after the grantor had been ill for a considerable period of time, and under circumstances which disclose not a domination and control by the plaintiff, but rather the influence of the defendant, who manifestly desired to be relieved of the ten-year period of trust. She might readily prefer a two-thirds interest in the property, obtained at her father's death, to a ten-year period of trust.

It was the defendant who arranged to have the witness Miller come to the grantor's house on that afternoon. It is quite apparent from the record that it was the defendant who was setting the stage for the revocation of the will. After the witness Miller had arrived, the grantor said he would like Miller to get Dr. Green and the lawyer to come to the house. The plaintiff suggested to Miller that he telephone, which was done. There is some confusion in the record as to just what

was said on that occasion, there being some contention that the grantor desired his "papers back" and that the grantor desired to change "his papers," the inference being that he desired to change both the deed and the will. Manifestly, while the will could be revoked by a separate instrument, the deed which had already been delivered could not thus be canceled. If, as is contended by the defendant, the grantor, on that occasion, expressed a desire to cancel or revoke both instruments, there is no showing that the plaintiff offered any resistance whatever thereto. While the record shows that prior to the marriage of the grantor and the plaintiff, the grantor had indulged in various expressions as to what he proposed to do for his daughter, nevertheless, after the said marriage of the plaintiff to the grantor, and apparently after portions of the monetary advancements heretofore mentioned had been made, various disinterested witnesses testified that the grantor expressed the intention of giving to his wife the home place, being the quarter section in controversy.

As was said in McNeer v. Beck, 205 Iowa 196, l. c. 198:

"'Undue influence,' as known in law, does not arise merely because opportunity therefor has been afforded or suggestion and advice given. More must appear before a written covenant granting real estate can be held for naught. Exercise of such persuasion must be so great as to overcome the will, destroy the free agency, and make the 'grantor' or donor the implement of the beneficiary's craft. Osborn v. Fry, 202 Iowa 129; Gilmore v. Griffith, 187 Iowa 327; Sutherland State Bank v. Furgason, 192 Iowa 1295; Olsen v. Olsen, 168 Iowa 634; Steen v. Steen, 169 Iowa 264, 266. Generally speaking, when there is absence of trust relationship, special confidence, and predominance of the beneficiary over the donor or 'grantor,' the 'burden of proof' is upon him who attempts to establish 'undue influence;' and this must be done by clear, satisfactory, and convincing evidence. Johnson v. Tyler, 175 Iowa 723; Sutherland State Bank v. Furgason, supra."

The mere fact that the plaintiff and the grantor were wife and husband does not create this confidential relationship in contemplation of law.

Manifestly, it would be impracticable to attempt to set out even the substance of all of the evidence in a case of this kind.

We have not so attempted. In fact, we have not even referred to all of the evidence, but upon the whole record, giving careful consideration to all of the competent evidence therein, we reach the conclusion that the defendant has failed in her burden to show that the deed was procured by the undue influence of the plaintiff.

III. It is contended by the appellant there was no proper delivery of the deed. What constitutes a proper delivery has been passed upon several times recently by this court. See Heavner v. Kading, 209 Iowa 1271; Davis v. John E. Brown College, 208 Iowa 480; Goodman v. Andrews, 203 Iowa 979; Lathrop v. Knoop, 202 Iowa 621; Kyle v. Kyle, 175 Iowa 734. We quote from the latter case as follows:

"That delivery is essential to the effectiveness of a deed to real estate is elementary, but just what amounts to a delivery is sometimes a question of doubt. Ordinarily, it is the simple transfer of possession of the written instrument from the grantor to the grantee, with intent on part of the grantor to convey and on the part of the grantee to acquire title to the property described therein. But an actual manual transfer of the paper is not necessary. A delivery may be effected by acts without words, or by words without acts, or by both words and acts. Assuming the instrument to have been properly executed ready for delivery, acts and words evincing intent to part with it and relinquish the grantor's right over it is a sufficient delivery. Whiting v. Hoagland, 127 Wis. 135; Woodward v. Woodward, 8 Halstead's Ch. (N. J.) 779, 784. It may be made direct to the grantee or to a third person in his behalf. Owen v. Perry, 25 Iowa 412; Clarity v. Sheridan, 91 Iowa 304; Adams v. Ryan, 61 Iowa 733; Matheson v. Matheson, 139 Iowa 511, 514. In final analysis, it may be said that delivery is a matter of intent, and any distinct act or word by the grantor with intent to pass the title to the grantee by transferring the deed to him or to another for his benefit is a delivery. Collins v. Smith, 144 Iowa 200, 203; Kneeland v. Cowperthwaite, 138 Iowa 193, 194; Schurz v. Schurz, 153 Iowa 187, 190; Criswell v. Criswell, 138 Iowa 607, 609."

Eliminating from consideration entirely all evidence on behalf of the defendant to which objection was made by the

plaintiff, it satisfactorily appears from the record that on October 21, 1929, the grantor intended that the deed to the quarter section in controversy should be delivered to the plaintiff herein. By the express terms of the will which was executed on the same day and the corrected will executed on the following day, which will was signed in the presence of two witnesses, the grantor stated he was then deeding to his wife in fee simple the quarter section in controversy, except a reservation of a life estate for himself. Moreover, the record shows that the grantor stated more than once, in substance, that he had left his property to his wife, just where he wanted it to be; that "he aimed not to have a dollar of his money go to John Lapel." John Lapel was the husband of the defendant.

It would unduly extend this opinion to comment at length upon the inconsistencies and conflicts on the question. While there are conflicting statements in the record, we are constrained to hold, upon the whole record, that there was a proper delivery of the deed in this case.

IV. It is contended by the appellant that the deed in controversy and the will should be construed together and considered as one instrument. It is also contended that the deed is testamentary in character, and that when the grantor revoked his will on March 4, 1930, he intended to cancel both the deed and the will.

It must be conceded that there is testimony in the record which to some extent supports this contention of fact. On the other hand, there is very substantial evidence to the contrary. The burden was on the defendant. Upon all the competent evidence in the record on the subject, we find against the defendant.

V. The defendant has offered evidence tending to prove the mental unsoundness of the grantor at the time of making the deed. Expert evidence based on hypothetical questions has been introduced. Non-expert witnesses have testified on the subject. It would serve no good purpose to dwell at length upon this evidence. Suffice it to say we have carefully examined the record and we reach the conclusion that the grantor was of sound mind October 21, 1929, when the instrument in question was executed.

Upon the whole record, we conclude that the trial court cor-

rectly found, and it follows that the cause must be, and is,—Affirmed.

All the justices concur.