EDITH MOORE ROBERTSON et al., Appellants, v. MARGARET RENSHAW et al. and J. S. WHITNEY, Intervener, Appellees.

No. 42956.

June 21, 1935.

Rehearing Denied December 19, 1935.

F. F. Faville, Bailie & Edson, and William A. Vassar, Jr., for appellants.

Whitney, Whitney & Stern, for appellees.

Hamilton, J.—Mrs. Helen Moore, surviving spouse of Henry G. Moore, deceased, died intestate on March 15, 1934, leaving at the time of her death as her sole surviving children the defendants, Mae Leget, Maude Boyce, Florence Klinger, and Margaret Renshaw. The plaintiffs Edith Moore Robertson and Irene Moore Hall are the only children of Henry Moore, Jr., son of Helen Moore who had predeceased her. On September 21, 1931, Helen Moore was the owner of the northeast quarter of section 18, township 90, range 37 west of the Fifth P. M. in Buena Vista county, Iowa, she having obtained title to said quarter section by deed from her husband prior to his death. On this date, to wit, September 21, 1931, Helen Moore signed and acknowledged three separate warranty deeds, identified in the record and introduced in evidence as Exhibits 1, 2, and 3. The grantees in Exhibit 1 for 80 acres of said land are Mae Moore Leget and Maude Moore Boyce. The grantee in Exhibit 2 for 40 acres thereof is Florence Moore Klinger. The grantee in Exhibit 3 for 40 acres of said real estate is Marguerite Moore Renshaw. These several grantees are the same identical persons as the defendants in this action. At the time of her death, these deeds were found in a safety deposit box in the Citizens First National

Bank of Storm Lake, Iowa, which box had been leased by said bank to Helen Moore, she being a customer of said bank, and said box had been held by her under lease for some time. The banker testified that when a box is rented two duplicate customer's keys are delivered to the customer and a master key is retained by the bank, and that it requires both a customer's key and the master key to enter the box. The box cannot be entered in any other way. He further testified that during her lifetime no one else would have access to this box except Mrs. Helen Moore. After the death of Mrs. Helen Moore, these four defendants appeared at the bank with the customer's key, and Mr. Ralph E. Sheffield, vice president and trust officer of said bank, opened the safety deposit box of Helen Moore and made out an inventory of what was therein contained, including the three deeds in question, and took a receipt which contained a written agreement indemnifying the bank and holding it harmless on account of delivering said deeds to said defendants, which was signed by all four of said defendants. The deeds were then taken by them and placed on record, and bear the filing stamp of the recorder's office of date of March 19, 1934, just four days after the death of Helen Moore, the grantor named in said deeds.

The only question involved in this case is the question of the delivery of these deeds. There is no question of undue influence or mental competency. The plaintiffs rest their case upon the naked legal question, contending that there was no delivery. The appellees in support of the decree of the lower court contend that there is a presumption of delivery from the fact that the recorded deeds were produced at the trial by the appellees and that the burden was on the plaintiffs to overcome by satisfactory proof this presumption of delivery. They also contend that the presumption is supported by other extrinsic evidence bearing on the question of intent to deliver. The testimony is quite brief. The circumstances surrounding the execution of these instruments, as related by Mr. Earl Leget, husband of one of the grantees, is to the effect that he and his wife, Mae Leget, were living at Storm Lake in September, 1931, with Mrs. Helen Moore at her home. He says: "I took Mrs. Moore down town in my car that day. She got out at the bank corner, at Schaller's bank. She went alone. We waited for her because she told us we could pick her up at the bank corner again, then we took her home that same day.

"Q. Did you have any conversation—did you hear any conversation that day after you had gotten Mrs. Moore in the car at the bank corner? Did you hear any conversation between Mrs. Moore and Mrs. Leget? A. Yes, sir.

"Q. Did you take any part in that conversation? A. No, sir.

"Q. Will you state what the conversation was?"

Over the objection that the witness, being the husband of one of the defendants and an interested party, was incompetent under the so-called Dead Man's Statute (Code 1931, section 11257), and that the conversation itself was incompetent, immaterial, irrelevant, and hearsay, the witness stated: "Why, Mrs. Moore told Mrs. Leget that she had the deeds all made out and that each girl was to get a forty. She made the south 80 out in partnership between Maude and Mae Leget and the other two forties was deeded separately to Margaret Renshaw and Florence Klinger."

Another witness for defendants, a Mrs. Lucy Bowers, a resident of Storm Lake, testified to the effect that she was acquainted with Helen Moore and lived diagonally across the street from her for something like sixteen years, and that they visited back and forth. She was then asked whether she ever had any conversation or talk with Mrs. Moore about the disposition of this quarter section of land, to which she gave an affirmative answer. She was then asked to relate the substance of the first conversation in regard to the disposition of said land. It appears that this conversation took place during the winter of 1930 and 1931; that in this conversation Mrs. Moore told her that she expected to leave 40 acres to each one of the daughters; that she was leaving to Mae Leget the 40 with the buildings on because she had no home. "Later she told me that Maude, meaning Mrs. Boyce, had lost her place and that she had changed her mind and was leaving eighty acres with the home buildings to Maude and Mae jointly, that she had deeded it to them. That was later when she was at Mrs. Colby's house and it was a year ago last winter.

"Q. What did she say about the other two forties of that quarter section? A. She was leaving a forty to each of her other daughters, Mrs. Klinger and Mrs. Renshaw.

"Q. Did she say she had deeded it to them?"

Over the objection that the question was leading and sugges-
tive and that it is incompetent and hearsay, the witness an-
swered: "Yes, she said she had deeded, that was the term or
expression she used, to them.

"Q. Who do you refer to when you refer to 'them'? A.
Well, to the daughters, to her four daughters. The eighty to
Mrs. Leget and the forty to Mrs. Klinger, and forty to Mrs.
Renshaw—eighty to Mrs. Leget and Mrs. Boyce."

Another witness, Inez Cutshall, testified that she was living
in Spencer in the years 1931 and 1932 and that she knew Helen
Moore; that Helen Moore resided at her home for a period of
time from October, 1933, to the latter part of January, 1934;
that she stayed there continuously; that she discussed with the
witness the disposition of this quarter section of real estate. She
was then asked:

"Q. Did she say to you as to whether or not she had made
any disposition of that farm? A. Yes, sir.
"Q. What did she tell you? A. She said *she had her busi-
ness affairs settled.* She said she had deeds made out for that
farm to her four daughters *and that at her death they would
receive the farm.*
"Q. *Did she say at her death the deeds would go to the four
daughters?* A. *Yes, sir.*
"Q. Did you have any further discussion with her in refer-
ence to the quarter section of land in Buena Vista County, Iowa?
A. She talked about it many times to me, because I was executor
of my father's estate and she was trying to advise me."

■■■ Mae Leget, one of the defendants, was placed on the
witness stand by the plaintiffs and in response to questions pro-
pounded testified that she was present at the Citizens Bank in
Storm Lake at the time the safety deposit box was opened in the
presence of Mr. Sheffield and saw the deeds taken from the box.
She was then asked to identify Exhibits 1, 2, and 3 and stated
that these exhibits were the deeds. On cross-examination she was
asked this question: "Mrs. Leget, did you know that defendants'
Exhibits 1, 2 and 3 were in the bank when you went down
there?" Over objection that it was not proper cross-examination,
incompetent, immaterial, and irrelevant, she answered: "Yes,
sir." "Q. How did you know those deeds were in the bank?"

This was likewise objected to because the witness was incompetent under the so-called Dead Man's Statute, and it was not proper cross-examination. She answered: "Well, I was told they were put there for us." Mr. F. F. Faville: "I move to strike this answer." "Q. By whom?" To this question there was no objection. "A. By my mother." Mr. F. F. Faville: "I move to strike this answer because the witness is incompetent under the Dead Man's Statute. It is not proper cross-examination, it is irrelevant and immaterial." We think it must be conceded that the witness was clearly incompetent to testify to any conversation had with her mother, but that the answer that she knew when she went to the bank that the deeds were there must be permitted to stand as competent.

This is substantially all the testimony with reference to the execution and delivery of the deeds, except that the plaintiff Edith Robertson testified to having received from Margaret Renshaw a letter during the month of April, 1934. The letter bears date of April 19th and contains, among other things, the following statement:

"Mother left just enough money lacking about $4.00 to pay all the taxes here on the farm, at Spencer and there in Okla. She had said several times I want to be sure and have enough money to pay all the taxes this spring. In 1930 she made the deeds to us four direct heirs, of her land here in Iowa. Mae gets the Spencer 80 and the car. Florence the NW¼ of 160. Myself the NE¼ of 160. Maude and Mae S½ of 160. *The only thing to do was to go to her bank deposit box.* The man in the bank before he turned over anything to us girls took an inventory of everything that was in the box. He found the deeds that had been made over to us girls. The abstract to Okla. farm, etc. * * * There was no disposal made of the Okla. farm and house in Tryon. She had always said the oil rights were to be divided equally between us four girls and you two as one heir," etc.

On cross-examination Mrs. Robertson testified that when she received this letter she knew that the Buena Vista county farm had gone to the four girls; that before she got the letter she knew that the four girls were to get the Buena Vista county farm; that she had had another letter telling her about this. A letter written by Mrs. Robertson to Mrs. Renshaw was introduced as a

part of the cross-examination, and in this letter is contained the following statement:

"Aunt Margaret, we aren't a bit satisfied with the way you have things outlined about the property. *Of course, we know as well as you that you folks were to get that Iowa land* but you knew too—that this Okla. land was to be ours. Grandmother has always told us that—in fact we aren't the only ones she told. As far as oil is concerned—there never has been any prospects near the farm," etc.

It appears that there was a 160-acre farm in Oklahoma and also some town property that was not disposed of in any manner by Mrs. Moore, and it would appear from this letter that the two grandchildren were expecting the Oklahoma farm and that the girls in Iowa would get the 160 acres, being the land in controversy. The evidence clearly shows without dispute that the grantor, Helen Moore, exercised ownership over this property up to the time of her death and that she rented the property and collected the rent, paid the taxes, etc.

Upon this record the trial court made the following findings of fact:

"In this case it is shown by the evidence in our opinion beyond all question of doubt that Helen Moore during her lifetime intended that the four daughters named in these deeds should have the land described in plaintiffs' petition after her death. This was no secret intention but was so expressed by her on numerous occasions to different people, relatives and friends. As shown by the letter, Defendants' Exhibit 8, the plaintiff, Edith Moore Robertson, admits that she knew that such was the intention of Helen Moore and also discloses the fact that she knew that her sister, Irene Moore Hall, knew of such intention. Of course, it is not the intention entertained by Helen Moore that she intended these four daughters to have this land that is controlling in this case, but it is very important as evidence in the case in determining what her intention was in making these deeds; and the care and custody of them after they were made and the manner in which they were left by her at the time of her demise. In view of this rule of law which we think is firmly established in this state that the question of delivery of these deeds depends largely upon the intention of the grantor, and

under the evidence in this case supported by the legal presumption above mentioned, we hold that there was a legal delivery of the three deeds introduced in evidence in this case and that such deeds convey title to the land in controversy to the grantees named in such deeds.''

■■■ There is considerable confusion in the pronouncements of this court on this question of what is necessary to constitute delivery of a deed. All the authorities agree that to make a warranty deed effective a delivery is necessary. It is equally clear by all the authorities that where a deed is signed, acknowledged, and recorded, the law presumes that it has been delivered. This presumption is, of course, a rebuttable presumption and may be overcome by any competent and satisfactory evidence to the contrary. Stiles v. Breed, 151 Iowa 86, 90, 130 N. W. 376; Browne v. Johnson, 218 Iowa 498, 255 N. W. 862. The settled· rule of evidence in this state is that the one seeking to set aside such a deed which is shown to have been signed, acknowledged, and recorded has the burden of showing nondelivery by proof that is clear and satisfactory, and this is true even though the recording is after the death of the grantor. Jones v. Betz, 203 Iowa 767, 210 N. W. 609, 213 N. W. 282; Davis v. Hall, 128 Iowa 647, 105 N. W. 122; Burch v. Nicholson, 157 Iowa 502, 137 N. W. 1066; Webb v. Webb, 130 Iowa 457, 104 N. W. 438; Johnson v. Lavene, 196 Iowa 471, 192 N. W. 885.

In the case of Arndt v. Lapel, 214 Iowa 594, 243 N. W. 605, opinion by Justice Grimm, he quotes extensively from the case of Kyle v. Kyle, 175 Iowa 734, 737, 157 N. W. 248, 249, wherein the court said:

''That delivery is essential to the effectiveness of a deed to real estate is elementary, but just what amounts to a delivery is sometimes a question of doubt. Ordinarily it is the simple transfer of possession of the written instrument from the grantor to the grantee with intent on part of the grantor to convey and on part of the grantee to acquire title to the property described therein. But an actual manual transfer of the paper is not necessary. A delivery may be effected by acts without words, or by words without acts, or by both words and acts. Assuming the instrument to have been properly executed ready for delivery, acts and words evincing intent to part with it and relinquish the grantor's right over it is a sufficient delivery. Whiting v. Hog-

lund, 127 Wis. 135, 106 N. W. 391, 7 Ann. Cas. 224; Woodward v. Woodward, 8 N. J. Eq. [4 Halstead's Ch.] 779, 784. It may be made direct to the grantee or to a third person in his behalf. Owen v. Perry, 25 Iowa 412, 96 Am. Dec. 49; Clarity v. Sheridan, 91 Iowa 304, 59 N. W. 52; Adams v. Ryan, 61 Iowa 733, 17 N. W. 159; Matheson v. Matheson, 139 Iowa 511, 514, 117 N. W. 755, 18 L. R. A. (N. S.) 1167. In final analysis it may be said that delivery is a matter of intent, and any distinct act or word by the grantor with intent to pass the title to the grantee by transferring the deed to him or to another for his benefit is a delivery. Collins v. Smith, 144 Iowa 200, 203, 122 N. W. 839; Kneeland v. Cowperthwaite, 138 Iowa 193, 194, 115 N. W. 1026; Schurz v. Schurz, 153 Iowa 187, 190, 128 N. W. 944, 133 N. W. 683; Criswell v. Criswell, 138 Iowa 607, 609, 116 N. W. 713. It is also well settled in this and other states that a deed duly executed and deposited with a third person with directions to deliver it to the grantee upon the death of the grantor is an effective conveyance; that such a deed vests the grantee with the title, but his right to possession and enjoyment is postponed until the grantor's death. In such case the delivery which the law requires to make a deed legally effective is complete when the deed is placed in the hands of the depositary; but it does not become effective for the purposes of possession and enjoyment of the property until the time comes for the secondary delivery by the person to whose keeping it has been intrusted. Sometimes the rule is stated to be that the transfer of title is effected by the delivery made by the depositary after the death of the grantor, but such delivery takes effect by relation as of the date when the deed was placed in the depositary's hands. The result is the same on either theory."

In the case of Davis v. John E. Brown College, 208 Iowa 480, 482, 222 N. W. 858, 859, opinion by Justice Faville, the deed was deposited with a bank with this written statement:

"This certifies that I have left with the Capital City State Bank, Deeds to certain real estate, now owned by me and described therein, which deeds are to be held by said Bank as Trustee for the Grantees named in said deeds and to be delivered to the Grantees named in said deeds only in case of my decease. Said deeds to be returned to me on demand by me, otherwise to be delivered to said Grantees.

"Sarah E. Davis."

The deed was never recalled by the grantor and the court held that this was an effective and valid delivery. It is conceded by the writer of the opinion that the weight of authority is against the conclusion reached by the court in that case. The writer of the opinion states:

"It is a well-established rule that delivery of a deed to a third party, to be held by the third party and delivered to the grantee upon the death of the grantor, there being no limitations or reservations as to such delivery, constitutes a good delivery to the grantee. [Citing cases.]

"In the instant case, the right to recall the deed upon demand of the grantor was expressly reserved in the written instrument under which said deed was left with the depositary. Does such reservation defeat delivery when not exercised?

"It is undoubtedly true that the weight of authority in this country sustains the general rule that, where the power to recall a deed deposited with a third party is reserved to the grantor, there is no effectual delivery, and the deed cannot take effect. See 18 C. J. 210, and many cases cited. This is obviously true where the right to recall is exercised by the grantor. In 18 C. J. 210, it is also stated: 'In a few cases, a power upon the part of the grantor to recall the deed has been held not to invalidate the delivery, where such power was not exercised during the lifetime of the grantor.'

"This statement of the text is supported by citations to three cases: Henry v. Phillips, 105 Tex. 459, 151 S. W. 533, and two cases from this court, Newton v. Bealer, 41 Iowa 334, and Lippold v. Lippold, 112 Iowa 134, 83 N. W. 809, 84 Am. St. Rep. 331. It is upon this exception that appellant relies.

"A brief review of some of our cases seems essential at this point. In Newton v. Bealer, supra, there was no delivery whatever to a third party as custodian.

"In that case the grantor executed a deed, naming a minor son as grantee, and placed the deed in a chest in the grantor's room. Four or five days before his death the grantor said to a son, not the grantee, pointing to the chest: 'After I am gone the deed and will will be found in that chest.' A few hours after grantor's death the deed was so found, and subsequently delivered to the grantee. We held that the intent of the testator was to pass title, and that there was a valid delivery. In the course of the opinion, we said:

" 'Where one who has the mental power to alter his intention, and the physical power to destroy a deed in his possession, dies without doing either, there is, it seems to us, but little reason for saying that his deed shall be inoperative, simply because during life he might have done that which he did not do. It is much more consonant with reason to determine the effect of the deed by the intention existing up to the time of death, than to refuse to give it that effect because the intention might have been changed.'

"We have recognized the rule that, not only in the case of a dependent minor child, but even as to one not so situated, the execution of a deed and placing the same in the grantor's own box or other receptacle, and wholly under his control until his death, constitutes a good delivery where there was evidence showing such was the intent of the grantor. McKemey v. Ketchum, 188 Iowa 1081, 175 N. W. 325; Tallman v. Cooke, 39 Iowa 402; Foley v. Howard, 8 Iowa 56, 60; Stow v. Miller, 16 Iowa 460, 463. See, also, Foreman v. Archer, 130 Iowa 49, at page 55, 106 N. W. 372. In McKemey v. Ketchum, supra, we said:

" 'The authorities are overwhelmingly opposed to the argument that the keeping of physical control of the paper by the grantor is conclusive against delivery. It has been ruled many times that an effective delivery of a deed is not negatived because it remained in the physical power of grantor to retake the deed, or because he retained mental power to alter his intentions. * * * Where one had the mental power to alter his intention and the physical power to destroy a deed in his possession, and dies without doing either, there is but little reason for saying that this deed shall be inoperative simply because, during life, he might have done that which he did not do. It is much more consonant with reason to determine the effect of the deed by the intention existing up to the time of death than to refuse to give it that effect, because the intention might have been changed. * * * We hold that the decree cannot be sustained merely because grantor kept the deed in his own box, and retained the power to destroy the deed—a power which he did not exercise. We recur to the point that all required is evidence that grantor intended to pass title.'

"In the foregoing cases the deed was in the custody of the grantor or under his immediate control."

The writer of the opinion then considers some of the cases where the deed was lodged with a depositary and finally concludes:

"Where a man executes a deed and places it in his own safety box, or in a satchel or chest in his room, and where it is wholly under his control to destroy if he sees fit, and he does not do so, we have held that, where extrinsic evidence discloses an intent to deliver, such a situation constitutes a legal delivery of the instrument to the grantee named. Logically there seems to be no escape from the conclusion that if such a grantor, instead of placing the deed in his own box and under his immediate control, places it in the hands of a third party, reserving the right to recall it, but fails to do so, and the extrinsic evidence shows an intention that the title should pass under the deed unless it was so recalled, this also constitutes a good delivery. In either case the grantor has the right and the physical ability to destroy the instrument, and if delivery is good in one instance it would appear to be good in the other."

The opinion concludes with this language:

"It may be that the rule announced herein is contrary to the weight of authority in the country, but it is a rule of long standing in this state, and is consistent with our previous cases. We are not disposed to depart from it at this time."

In the instant case the grantor made the deeds in question and on the very day of their execution told one of the grantees what she had done, freely talked to the neighbors, both of what she intended to do and of what she had done, stating that she had deeded the property to these girls. The deeds were placed in her safety deposit box in the bank, and, so far as this record is concerned, they were never disturbed thereafter. The grantees knew where the deeds were, they had in their possession the key to the deposit box. When and how they came into possession of the key is not shown by the record. Counsel for plaintiffs emphasize the fact that in the letter, Exhibit C, written by one of the grantees to the plaintiffs in April, 1934, the writer stated, "He found the deeds that had been made over to us girls," and from the use of this word "found" it is argued that the existence of the deeds was unknown to the grantees and that the writer of this letter used the word "found" in the sense that they were

"discovered." The letter when read as a whole will not bear out this interpretation. In fact, it might be inferred from another sentence in the letter that everything had been arranged between the mother and the daughters. She says in the letter: "The only thing to do was to go to her bank deposit box." It may fairly be inferred from this letter that she uses the words "the only thing to do" in the sense that the mother had made the transfers and everything had been done that was necessary to be done and that nothing remained to be done except to go to the deposit box at her death and take up the deeds. This interpretation is in accordance with testimony of the disinterested neighbors and is also in harmony with the testimony of Mr. Leget, who testified to overhearing a conversation between the mother and her daughter Mrs. Leget the day the deeds were executed, and in harmony with the actions and conduct of the grantor in permitting the deeds to remain in the deposit box until her death.

While the writer of this opinion, if it were an original proposition, would not be inclined to go to the extent of the rule laid down in the recent case of Davis v. John E. Brown College, supra, yet, in view of the fact that it appears to have been fully, carefully and thoroughly considered, and was decided as recently as June, 1929, and although the rule thus announced is, as we think, contrary to the great weight of authority on the subject, it has support in a few of the prior pronouncements of this court beginning with the case of Newton v. Bealer, 41 Iowa 334, which is reasserted and adhered to in this recent case, and we are not inclined at this time to interfere with the rule thus established and so long adhered to in this state. We think the facts bring this case squarely within what we will call the "minority rule" announced by Justice Faville in the John E. Brown College case, supra, and the decree of the lower court is therefore affirmed.—Affirmed.

ANDERSON, C. J., and ALBERT, MITCHELL, DONEGAN, POWERS, and RICHARDS, JJ., concur.