Mrs. Clifford Keune et al., Appellants, v. Peter McCauley, Appellee.

No. 45161.

JUNE 18, 1940.

C. N. Houck and Cutting & Cutting, for appellants.

E. P. Shea and T. H. Carolan, for appellee.

HAMILTON, C. J.—The grantor, Willie McCue, or William McCue, was a bachelor 77 years of age. He, with his bachelor brother, Terrence, who died in 1935, had for many years resided on a farm in Winneshiek county, Iowa. After Terrence's death, Willie McCue continued to live alone on the farm until March 14, 1938, when, on account of illness, he was taken to the hospital at Decorah, Iowa, where he departed this life on March 21, 1938. He was the owner of 317 acres of land located in Winneshiek county. His heirs consisted of numerous cousins one of whom, Peter McCauley, is the grantee in a deed to 160 acres of said land, being the deed involved in this suit, and others of whom are plaintiffs-appellants herein.

This is another case of a person waiting until the last days

of his life to undertake the important task of disposing of his property. As is usually true in such cases, the transaction is shrouded in more or less uncertainty and sharp conflict in the testimony relating to the surrounding circumstances. Many times these cases are not entirely free from doubt and this is true in the instant case. Nevertheless, the court must decide the questions involved. Our task is to ascertain, if possible, the purpose and intent of the grantor and determine his competency to carry into execution such intent and, if so, to give his intent effect. In this spirit we have carefully read the record of the testimony and are of the opinion that the weight of the evidence supports the trial court's conclusion.

It is impossible to narrate in this opinion all of the facts and circumstances, but the testimony of the hospital attendants and the attending physician and that of the grantor's banker and the attorney who drew the instrument, all of whom can fairly be classified as disinterested, is to the effect that, while the grantor was indeed a sick man suffering with a heart ailment which made it difficult for him to talk and breathe while lying down, yet they all agree and so testified that they thought his mind was sound, that he understood the nature of the business in hand and he was capable of transacting such business at the time the deed in question was executed.

On the question of undue influence, the evidence is entirely lacking. The record fails to disclose any particular reason or motive for the grantor singling out three particular collateral heirs upon whom to bestow his property (there were two other deeds not involved in this litigation) except the bare statement made by the grantor to some of those who were visiting him at the hospital to the effect that Peter McCauley, the grantee, and his wife were his best friends. It appears that Peter and his wife had visited with the grantor at his home shortly before he went to the hospital and on the day this deed was executed, to wit, the 17th day of March, 1938, they again visited him at the hospital and there was some talk between Peter and the grantor concerning the execution of some papers. Mrs. Peter McCauley, as a witness for the defendant, testified that she over-

heard a part of this conversation, in which she took no part, and that McCue said to McCauley: "Go up and get Ed Haines. He wanted to make out some papers they were talking about." This was about 3 p. m., and at that particular time there was no one else in the room. Peter McCauley did as he was requested. Haines, the banker, who was quite well acquainted with McCue, testified: "Peter McCauley came into the bank that day and told me that McCue wanted to see me." Haines accompanied McCauley to the hospital and there talked with McCue, the substance of which talk was that McCue, realizing that he would probably not get well, wanted to do something about his property. Haines inquired what he had in mind and McCue told him that he wanted to execute deeds. Haines wanted to know if he wanted to execute a will or deeds and McCue said he wanted to execute deeds. McCue then proceeded to tell Haines about the respective tracts or pieces of land and to whom he desired to deed the same; the 160 acres, constituting the home place, was the land he wanted to deed to Peter McCauley; another piece was to go to James Doran and a 45-acre piece to go to Robert Welsh. Haines testified that it was difficult for McCue to talk on account of shortness of breath but he was able to understand him and to learn from him the general description of the three separate tracts of land so as to enable him to go to the courthouse and get the legal description thereof and this he proceeded to do. Peter McCauley went along with him. After he looked up the description, Haines then said to McCauley that he thought "this would be a job for an attorney to attend to right". To which McCauley said, "Who do you think we had better get?" Haines replied, "I don't care, it doesn't make any difference to me at all. That is up to you folks." Then Peter suggested Mr. Carolan and they went to Mr. Carolan's office and informed him as to what had taken place. Carolan called the attending physician, Dr. Larson, and talked to him after which they all went back to the hospital. Attorney Carolan testified that he had known McCue for 20 years. He went into the hospital room with Mr. Haines and

McCue greeted him, that is spoke to him. Haines told McCue that he had brought Carolan to complete the making of the deeds they had discussed earlier in the day. Carolan testified:

"I asked Willie McCue several questions with reference to the property that he had, his real estate, and he told me he wanted it to be conveyed. I was testing Willie McCue's ability to know what he was doing and he told me that he wanted the home place to go to Peter McCauley, a hundred and sixty acres, and he said he wanted the Elliott place down by Joe Kelley's to go to James Doran, and he gave me the acreages, which, as I recall it, was two or three acres one way or the other; it was 112 and he said it was 110. Without question that was the acreage he intended to go to him, and then he told me he wanted 40 acres or 44 acres down near Peter McKenna to go to Robert Welsh and a nurse then asked us to leave the room. * * * to step out for a moment, and we went out into the hall, out of the room at that time."

The record shows that McCue had considerable company that day and when the attorney and Haines went back to the room to finish the execution of the deeds about 5 or 6 o'clock, McCue appeared to be drowsy and wanted to sleep and the doctor suggested that they come back later. They then went up town and came back and the deeds were executed between 7 and 8 o'clock that evening. Those present were the doctor and two attending nurses, all of whom testified, in substance, that McCue was competent, was of sound mind and understood what he wanted to do. The deed to McCauley was placed on a table by the bed and McCue was propped up in bed and given a pen. It was difficult for him to write; his signature is scarcely legible; he wrote slowly and with some effort. He also signed the deed to Doran, but the exertion seemed to tire him and caused shortness of breath and they did not go on and finish the entire transaction. The deed to Welsh was not signed and, as I understand the record was never signed. He died on the 21st day of March. The doctor was asked the following question:

"Q. Now, you wouldn't say, would you, Doctor, that during all of the 17th he knew what he was doing? A. Yes, he seemed quite clear on the 17th.

"Q. You didn't see him at all times on the 17th? A. On the 17th he didn't receive any sedative until about eleven P. M."

He had been given a sedative on the evening of the 16th, but the doctor testified that he would feel no effects of this at the time the deed was made on the 17th. The record shows that McCue had transacted his own business at all times; that for a number of years he had followed the custom of having a taxi drive out to his home on Saturdays and take him to town to do his trading or to dispose of produce and that the last trip was on the 12th of March, 1938, when he personally transacted some business, receiving a check for $49.98 which bears his endorsement. When he was admitted to the hospital, he was admitted as a person in his right mind and the superintendent or head nurse testified that he selected his own room and got the best room in the hospital. As a witness for plaintiff, she said:

"This is a normal case of hypertension brought to the hospital, fully equipped to decide what he wanted in his case and did until death. * * * March 17th, the third day after he entered he was particularly keen. * * * He was not of unsound mind at all at any time. He was very sound at all times."

Another nurse, who cared for McCue and who was present when the deed was made, as a witness for defendant, testified:

"A hypertensive heart wouldn't tend to weaken the mind. The patient who had a hypertensive heart would tend to be restless. The patient had a hypertensive heart and was restless."

Dr. Larson testified that he was called to the farm on the 14th and took McCue from his home to the hospital in the doctor's car. He diagnosed his trouble as hypertensive heart disease which is a disturbance of the heart due to high blood pressure which induces enlargement of the heart and this

patient's heart was enlarged. There was decompensation—that is where you get swelling of the legs and soreness and weakness. Decompensation refers to the heart and means that the heart is not able to do the work it is supposed to and this is why you get swelling of the lower extremities. The doctor testified further:

"I talked to Willie on the 14th of March concerning his affliction. He gave me a short history at that time. He told me he had a lot of shortness of breath on exertion for at least one year and much swelling of his feet and legs for several days, he had a bad cough for two weeks; he had had a cold and flu at that time and ever since he had been coughing; told me it had been hard for him to get around and he sat in a chair most of the time, short of breath and couldn't lie down. * * * Willie McCue's chief complaints were shortness of breath and inability to get his breath when lying down and swelling in the lower extremities. He said he had been quite short of breath upon exertion for a year and had become much worse lately. There was increasing edema, swelling of the lower extremities during the last few days, worse on the right side. * * * Based upon my physical examination and from what I have testified to, it is my opinion Mr. McCue knew what he was doing the night of the 17th of March, when I saw him. * * * I would say he was of sound mind * * * I was present when Willie McCue signed plaintiffs' 'Exhibit A', a Warranty Deed, on the night of March 17th, 1938. As I recall it was about 8:00 P. M. this was signed. Mr. Carolan and a special nurse, Miss Musser, and myself were there. As to whether Miss Grimes was present I will say I believe she was, though I am not absolutely sure. Based upon what I have testified to and the examinations made by me, at the time Willie McCue signed 'Exhibit A' I think he was competent to transact business. I think Willie McCue knew what he was doing at the time he signed this deed. Mr. Carolan read the deed and explained it to him and he said it was o. k. and signed it. I believe he signed another additional instrument. * * * The signing did tend to tire him, make him a little

short of breath at the time. I think I remember that there was a third deed there. I don't remember if anybody suggested it or not as to whether Willie was too exhausted to sign the deed at that time, but anyway it was agreed that we should wait a little further before it was signed. The patient was too exhausted to sign the other deed.''

While the record shows that Peter McCauley was around the hospital that day, there is nothing in the record as to any particular activity on his part except what has been hereinbefore related. There is one other incident called to our attention in argument by appellants where Peter interceded, in behalf of some of McCue's friends, with the nurse, in gaining them admittance to his room. All this falls far short of showing undue influence. Neither is there anything in the relationship, as disclosed by the evidence, which amounts to proof of a fiduciary relationship between the grantee and the grantor.

The further claim of the appellants that the instrument was testamentary in character is unsupported by the testimony. Neither does the question of consideration enter into the solution of the problem. No one contends that it was a sale of the property. If it was anything, it was a gift of this farm, carried out by means of the execution and delivery of the deed in the lifetime of the grantor. The record plainly indicates that this was done under the belief on the part of the grantor that he was on his dying bed and would not recover. He expressed this not only to Haines, but to the attorney and to McCauley and one of the nurses also testified that, in her opinion, McCue was acting under the belief that he would not recover. It was an attempt on his part to make a disposition of his property while living. There can be no doubt from the reading of this record that this was his intention. There is no evidence whatever that anyone ever made a suggestion to him as to the donees or as to the method of carrying out his intention. The deed to McCauley was taken by the attorney to his office and on the 19th was delivered to McCauley by the attorney. McCauley examined it and handed it back to Mr. Carolan, requesting him to keep the

deed for him. It was placed of record by McCauley after the death of Willie McCue.

In the brief and argument, the appellants raise the question of want of delivery. Apparently, this is an afterthought and is contrary to the theory on which the case was tried and not in line with the pleadings. A reading of the plaintiffs' petition and an examination of the record would indicate that the plaintiffs bottom their right of recovery, not on the theory that the transaction had not been completed, but on the theory that the grantor was in such condition as to be incompetent to do the thing that was done. That this is true is indicated by a colloquy between court and counsel at the very beginning of the trial. Plaintiffs placed on the witness stand, as their first witness, Attorney Carolan for the purpose of identifying the deed and offered the same in evidence. This was objected to on the part of defendant as calling for a transaction with a person since deceased and finally because it was a privileged communication between attorney and client. The witness testified that the deed was in his handwriting and the signature in the handwriting of William McCue.

"The Court: So far as I can see under the pleadings there is no issue at all as to the deed.

"Mr. Houck: No, I don't think there is.

"The Court: The deed was delivered as plaintiff claims.

"Mr. Houck: That is all; we reoffer it in evidence."

It would serve no useful purpose to review again the many authorities cited by appellants or to set out the testimony of numerous witnesses for the plaintiffs who visited the sickroom on the day the deed was executed, most of whom were interested witnesses who testified in substance that McCue was mumbling, that they were unable to understand him and that he was of unsound mind. As to most of these witnesses, the basis for their opinion was very, very weak and should not be held sufficient to overcome the positive statements of the doctor and nurses and Mr. Haines and Mr. Carolan, whose testimony we have heretofore discussed.

Most, if not all, the questions raised by this appeal were involved in the case of Arndt v. Lapel, 214 Iowa 594, 243 N. W. 605, where the legal principles governing such questions are very fully discussed. The law as announced in this case, as we understand, is still the law of this state. While the case of Orris v. Whipple, 224 Iowa 1157, 1171, 280 N. W. 617, 624, expressly overrules Davis v. John E. Brown College, 208 Iowa 480, 222 N. W. 858; Robertson v. Renshaw, 220 Iowa 572, 261 N. W. 645; and Boone Biblical College v. Forrest, 223 Iowa 1260, 275 N. W. 132, the Whipple case expressly states:

"We conclude that the rule announced in Lathrop v. Knoop, supra [202 Iowa 621, 210 N. W. 764], Goodman v. Andrews, supra [203 Iowa 979, 213 N. W. 605], and Arndt v. Lapel, supra, is the better rule and should be adopted, followed and reaffirmed as the definite and fixed rule of this court in this class of cases."

Under the rule announced in Arndt v. Lapel, supra, even though the question of delivery were in issue, the evidence in this case clearly evinces an intent on the part of the grantor to pass the title to the grantee and to relinquish the grantor's right over the same.

This court, in the case In re Estate of Axness, 142 Iowa 40, 43, 120 N. W. 465, 466, recognized the rule that one may make a valid gift of land and the rule therein announced governing gifts by deeds of conveyance of real estate is not unlike the rule applicable to wills. We therein said:

"The rule of law is that when a grantor or testator understands fully and intelligently the nature and extent of his estate and the nature of the business he is engaged in when making a will or deed and recollects the objects of his bounty, he is capable of making a will or conveyance." (Citing cases.)

A case involving the execution of a will by a testator in a dying condition and in which the will was upheld is Convey v. Murphy, 146 Iowa 154, 124 N. W. 1073. In that case, testator was in the last stages of pneumonia and was unable to talk except with great difficulty. When asked what he wanted done, he

simply said that he wanted his invalid children taken care of and the will drawn in such a way that his property would be used for their support. The scrivener drew the will and read it over to him and, when asked whether it was the way he wanted it, he simply said "yes". He died a few hours after the will was executed. The priest had, in the case of this testator, already administered the last sacrament. The point is that, while he was sick unto death, the illness was not of such a character as to affect his mentality to the extent of rendering him incompetent to dispose of his property. In this respect, the case is parallel with the instant case.

McCue, according to the testimony of those most capable and who had the best opportunity of knowing the condition of his mind, knew what he wanted to do with his property. He expressed his purpose and intention and, with the assistance of his friends and attendants, he was able physically to carry out such intention even though his physical and mental condition might be said to be such as to render him incompetent to transact business generally.

The able trial court had the advantage of seeing and hearing the witnesses and was in a much better position to determine the close question involved than the members of this court and his decision should not be molested, under such circumstances, unless we are able to say that it is contrary to the law and evidence. This we are unable to do.

It follows that the judgment and decree of the trial court should be and is affirmed.—Affirmed.

All JUSTICES concur.